## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| JAY HARRIS, HARRIS HOSPICE, INC.; | CIVIL NO.: |
| Plaintiffs, | |
| v. | |
| TLS Management and Marketing Services, LLC | RESCISSION; DAMAGES; BREACH OF FIDUCIARY DUTIES |
| Defendants | |

## COMPLAINT

**COME NOW** Plaintiffs, JAY HARRIS and HARRIS HOSPICE, INC., through the undersigned attorney and respectfully ALLEGE, STATE and PRAY:

### NATURE OF THE CASE

1.     This is an action for rescission, damages, and breach of fiduciary duties.

### JURISDICTION AND VENUE OF THE COURT

2.     This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C.A. § 1332 (a)(1), since there is diversity of citizenship between Plaintiffs and Defendant and the amount in controversy, exclusive of costs and interest, exceeds seventy-five thousand dollars ($75,000.00).

3.     Venue is properly placed in this judicial district pursuant to 28 U.S.C. § 1391(a) since the events and claims complained herein occurred in the District of Puerto Rico.

## THE PARTIES

4.      Plaintiff Harris Hospice, Inc. is a corporation organized under the laws of the State of Texas. Mr. Jay Harris is its President.

5.       Plaintiff Jay Harris is a resident of the State of Texas.

6.      TLS Management and Marketing Services, LLC ("TLS") is a limited liability company organized under the laws of Puerto Rico.  Prior to filing the instant action, Plaintiff Harris requested TLS to inform whether it has any current members residing in Texas.  TLS did not respond. Accordingly, upon best information and knowledge, there is full diversity between Plaintiff and TLS' members.

## FACTS

7.      TLS is a tax consulting firm which enjoys the tax exemption benefits of Act 73 of 2008 overseen by the Department of Economic Development and Commerce.

8.      Under Act 73 decree, State corporate taxes for services provided from Puerto Rico are paid at 4% rate in Puerto Rico, as opposed to applicable State tax rates in other states.  Also, because services provided from Puerto Rico are exempt from payment of federal taxes, businesses which export services from Puerto Rico do not have to pay federal taxes.

9.      TLS offers a so-called "U.S. Possession strategy" which allows U.S. taxpayers who are not willing to immediately move to Puerto Rico the opportunity to utilize TLS' Act 73 decree to export services from Puerto Rico.

10.      TLS does this by allowing its clients to become members of TLS under a wholly owned class division from which businesses (or part thereof) can be operated, utilizing resources engaged by TLS.

11.    After attending a TLS seminar, on March 27, 2014 Harris Hospice signed a Services Agreement for the exportation of webpage marketing services from Puerto Rico through a TLS Division conformed by "Class T" units wholly owned by Harris ("TLS' Harris Division").  See, Services Agreement, **Exhibit A**.

12.    The initial term of the Services Agreement was one year, with automatic renewal terms for twelve (12) months, unless termination notice was provided at least ninety (90) days prior to the expiration of the Initial and/or Renewal Term.

13.    The TLS' Harris Division provided and invoiced all agreed upon services for web marketing services to Harris Hospice. This corporation would then make payments for rendered services to TLS' Harris Division, thus subjecting said income to a 4% reduced tax rate.

14.    During 2014, Harris Hospice made payments to TLS' Harris Division in the amount of $637,042. See, Checks for TLS Mgt. and Marketing Services, LLC, **Exhibit B**.

15.    As per TLS' program, all funds paid from Harris Hospice to TLS' Harris Division would be considered Puerto Rico income for tax purposes.

16.    In order to allow such funds to go back and be available to Harris, TLS implemented a "loan program".

17.    As per TLS' program, Harris applied for a loan of the moneys available in his TLS' Harris Division account.  Accordingly, on April 1, 2014, the parties signed a "Security Agreement", together with a "Line of Credit Promissory Note".  According to these documents, Harris, personally, could loan from his TLS' Harris Division up to $1.2 million by means of a line of credit.  The loan would have a maturity date of five years. See, loan documents, **Exhibit C1-C3**.

18.    In total, Harris loaned from the TLS' Harris Division $371,000.  See, "Balance Sheet Class T, as of July 31, 2015", **Exhibit D**.

19.    In November 18, 2014, Harris Hospice sent a letter to TLS providing due notice that it would not renew the Services Agreement with TLS after its initial expiration in March 2015. However, after a phone conversation with then TLS' Managing Director Ricky Rodríguez, Harris Hospice decided not to terminate the Services Agreement and, instead, place it "on hold".  See, termination letter and hold letter, **Exhibit E1-E2.**

20.    Pursuant to Appendix B of the Services Agreement, if Harris Hospice advised TLS at least ninety (90) days prior to the expiration of the Services Agreement of its desire not to receive any further services and not to pay the fees, but to keep the TLS' Division in place, an annual Compliance Fee equal to the greater of (a) $10,000 or (b) 1% of the TLS' Division's Retained Earnings would replace the Management Fees.  See, Exhibit A.

21.    As per the timely notice by Harris Hospice to place TLS' services on hold, TLS charged the TLS' Harris Division $10,000.  This charge is reflected in the Interim Income Statement (January through February 2015) issued by TLS.  See, "Profit and Loss- Class T", **Exhibit F**.

22.    But, the economic situation of Harris Hospice did not improve.  As a result, Harris Hospice started to take appropriate measures to terminate the Services Agreement while also taking measures to avoid a major tax impact due to such termination.

23.    Harris Hospice engaged a third party-- Accounting Solutions Group ("ASG")-- to prepare an "exit strategy" that would avoid the payment of taxes upon Harris' exit from TLS' "U.S. Possession strategy" under Act 73.

24.     ASG prepared an "exit strategy" which consisted of the assignment of the TLS' Harris Division units-- wholly owned by Harris-- to a newly formed Puerto Rico LLC by the name of Sandpiper, LLC.

25.     By assigning the membership interest of Harris Hospice to Sandpiper, the funds upon the termination of the TLS' Harris Division would remain in Puerto Rico.  This way, Harris would avoid the payment of taxes over said funds and delay any distribution to a future date when Harris could become a Puerto Rico resident, subject to the lower Puerto Rico 4% corporate tax rate.

26.     When all necessary steps were finalized by ASG to execute the "exit strategy", on June 24, 2015 Harris Hospice sent a letter to TLS requesting that the Services Agreement be terminated. Harris also requested that all units from the TLS' Harris Division be transferred to Sandpiper, LLC, so the "exit strategy" could be accomplished and the tax impact on Harris be avoided.  See, Termination Letter and Assignment Letter, **Exhibits G1-G2**.

27.     On July 7, 2015, TLS requested Harris Hospice to provide all information regarding the newly formed Sandpiper, LLC in order to conduct the "necessary steps to finalize your contractual relationship with TLS and to analyze the tax implications of your request to transfer ownership".  As informed by TLS, "if this process is not done property it could present significant adverse tax implications".

28.     Notwithstanding its previous termination notice, to avoid "early termination fees" to be charged by TLS, on August 27, 2015, Harris Hospice rescinded its termination notice. See, rescission letter by Harris, **Exhibit H**.

29.     However, on October 13, 2015, TLS sent a letter to Harris Hospice executing the termination process of the Services Agreement.  In doing so, TLS declined to have the units in Harris Hospice transferred to Sandpiper.  <u>See</u>, termination letter by TLS, **Exhibit I**.

30.     TLS also misapplied termination charges, including "early termination fees" purposely triggered by TLS' decision not to comply with Harris' rescission letter.  Specifically, TLS informed Harris that Harris Hospice would "receive an estimated $371,0000 of taxable income related for your outstanding loan and an estimated $46,765.08 of taxable non-qualified dividend income…".  <u>See</u>, Exhibit I.

31.     TLS further informed that for the disbursement of the $46,765.08 left in TLS' Harris Division, Harris Hospice was required to sign a "Financial Statement Acceptance", "Liability Release Agreement", "Authorization for the Transfer of Membership Interest", and endorsed "Membership Certificate of Class T" units for their transfer to TLS.  <u>See</u>, Exhibit I.

32.     The Services Agreement does not require the signature of any such documents to close a Division.  But, TLS was adamant not to release the moneys due to Harris Hospice, unless such documents were signed.

33.     Although Harris eventually signed the documents to be able to recover the funds left in the TLS' Harris Division, TLS still refused to return the remaining amounts in the account by stating that it was contingent on the "immediate execution" of the TLS' documents.  <u>See</u>, Letter by TLS' counsel refusing to return due moneys to Harris, **Exhibit J**.

34.     As a result, TLS has unduly forfeited funds belonging to Harris.

35.     As per the last financial statement issued by TLS as of July 2015, TLS' Harris Division account had $108,844.83.  <u>See</u>, Exhibit D.

36.    By not accepting the transfer of the units to Sandpiper, TLS also caused Harris undue tax impact.

37.    Although TLS' Harris Division has been supposedly completely terminated, TLS has not issued the applicable tax forms.

38.    To make things worse, during the process to terminate the Services Agreement and prepare the 2014 personal income tax returns, Harris learned that TLS could potentially be considered a Passive Foreign Investment Company ("PFIC"), under U.S. IRC sections 1291 or 1298(f).

39.    If so, Harris "investment" in TLS would trigger a tax impact of approximately 40% in IRS payments, plus penalties and fines.

40.    In the case of Harris, this would amount to no less than $190,000 in additional federal tax payments.  Consequently, the whole TLS' "U.S. Possession strategy" would not have represented any kind of tax savings at all and it added costs and expenses related to TLS fees.

41.    TLS never disclosed its PFIC or potential PFIC status to Harris, thus deceiving him into a "U.S. Possession strategy" that only represented fees for TLS and no tax savings for Harris.

42.    Upon learning of its potential PFIC impact, in September 2015 Harris asked TLS whether it has a PFIC status.  See, Email by Harris asking TLS about its PFIC status, **Exhibit K**.

43.    TLS refused to directly respond.  However, it then sent an email "memo" to selected clients informing that "TLS does appear to qualify as a PFIC".  See, Letter by TLS informing of its PFIC status, **Exhibit L**.

44.    Currently, TLS is being actively investigated by the criminal division of the IRS for this and other issues, as per Whistleblower complaint filed by its former Managing Director

Ricky Rodríguez, against TLS' principals. <u>See</u>, Whistleblower complaint before the Department of Treasury- Internal Revenue Service, **Exhibit M**.

**FIRST CAUSE OF ACTION**
**(Rescission of Contract)**

45.    Plaintiffs incorporate each of the preceding allegations into this paragraph.

46.    TLS offers services to implement "tax saving strategies".

47.    Article 1210 of the Civil Code establishes that "Contracts are perfected by mere consent, and from that moment, each of its parties is obliged, not only to fulfill what was expressly agreed to, but also to respond to the consequences that, depending on its nature, conform to good faith, the use, and the law".  Consequently, as part of its tax saving strategies, TLS needed to make sure that the "U.S. Possession strategy" would not qualify as a PFIC to avoid federal taxes and penalties for its clients.

48.    Upon best information and knowledge, TLS did not take any such steps or, if it took them, they were later set aside, causing TLS to qualify as a PFIC.

49.    This will cause TLS' clients to pay a PFIC tax rate, plus penalties, that were not disclosed (and were not considered) when presenting TLS' tax saving strategies to Harris.

50.    Even if TLS was not a PFIC, TLS did not timely disclose to Harris its potential PFIC designation, so he could seek advice and knowingly decide whether to enter into TLS' "U.S. Possession strategy" or not.

51.    TLS purposely avoided disclosure of such information to gain Harris as a client and obtain more fees for services. TLS only disclosed its apparent PFIC status to Plaintiffs after they had enrolled in TLS' "U.S. Possession strategy" and paid substantial fees to TLS. This constitutes gross omission and/or omission with fault.

52.    Had Harris Hospice been informed about the PFIC potential status of TLS, Plaintiffs would not have invested moneys in such TLS "strategy".

53.    Pursuant to Article 1247 of the Puerto Rico Civil Code, Harris Hospice may demand the rescission or specific compliance of the Services Agreement.

54.    Plaintiffs demand rescission.    As such, they are entitled to obtain full reimbursement of the "management" fees that TLS collected.    This amounts to no less than $165,000. They also entitled to the $108,844.03 that remained in the TLS' Harris Division account at the time that TLS terminated the "Services Agreement" and which TLS wrongfully seized without any legal basis to do so.

55.    Additionally, if Harris was required to pay PFIC taxes, he would have to pay to the IRS no less than $190,000, plus applicable fees and fines.

56.    TLS is and/or will be liable for any additional taxes, penalties and/or fees that the IRS charges to Harris as a result of its PFIC designation and the subsequent taxes to be imposed on Harris Hospice as a result thereof.

**SECOND CAUSE OF ACTION**
**(Breach of Contract)**

57.    Plaintiffs incorporate each of the preceding allegations into this paragraph.

58.    TLS drafted the Services Agreement signed with Plaintiffs. As such, the Services Agreement is an adhesion contract, for which reason all unclear terms shall be interpreted against TLS.

59.    TLS breached the Services Agreement signed with Harris.

60.    As per the July 2015 financial statement for TLS' Harris Division, his account had $108,844.83.

61.    TLS forfeited all these funds by making incorrect charges and inventing other charges that are not established by contract.

62.    TLS computed incorrectly the Management Fees charged to Harris Hospice throughout the term in which Harris Hospice received services from the TLS' Harris Division.

63.    TLS also incorrectly duplicated termination charges by collecting a Compliance Fee for Suspension of Service plus a Termination Fee.

64.    TLS wrongfully charged Harris Hospice an Early Termination Fee which TLS was not entitled to collect since it was TLS, and not Harris, the party which terminated the Services Agreement.

65.    TLS incorrectly charged Harris Hospice prepaid management fees that are nowhere allowed in the Services Agreement.

66.    TLS also charged incorrect allocated expenses.

67.    When Harris asked questions to TLS about the fees been charged, it refused to respond.  No explanations were ever offered by TLS to Harris.

68.    Furthermore, upon recognition by TLS that it kept moneys which were due to Harris, TLS wrongfully declined to return such funds, unless Plaintiffs signed, among others, a liability release in favor of TLS.  Since TLS established as a condition precedent that Harris sign a liability release in favor of TLS to recover the moneys in TLS' Class T Division, the agreement is null and void.

69.    It is estimated that TLS owes Harris, as per the provisions in the Services Contract, no less than $108,844.83 in undue retained earnings by TLS.

70.    TLS is liable for the return of such funds illegally retained from Harris Hospice, as well as the damages caused by such breach.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duties)

71.     Plaintiffs incorporate each of the preceding allegations into this paragraph.

72.     TLS is not registered in the Securities and Exchange Commission.

73.     Since TLS offers units and/or stocks for sale to the public (which later become TLS' "clients"), it has to abide by the rules and regulations of the Securities and Exchange Commission.

74.     TLS breached the rules and regulations of the Securities and Exchange Commission by soliciting the investment of Harris; providing Harris with false and/or misleading statements regarding TLS; and failing to provide a prospectus with full information and disclosure as to TLS.

75.     Additionally, upon becoming a member of TLS' Harris Division, the parties signed a "Buy Sell Agreement".

76.     As the 100% owner of the Class T units issued by the TLS' Harris Division, Harris acquired a .02% membership interest in TLS as a whole.

77.     As a member and/or shareholder of TLS, its directors and principals have fiduciary duties which they failed to comply with.  Specifically, TLS failed to disclose important information about its "U.S. Possession strategy" and declined to explain charges made to its members and/or shareholders, including Harris.

78.     Additionally, pursuant to the Buy-Sell Agreement, Harris could not transfer his units at TLS, except with authorization by TLS.

79.     Upon decision by Harris to terminate his participation at TLS, he requested that his units and/or shares be transferred to Sandpiper to avoid a sudden taxable income.

80.     TLS arbitrarily and maliciously withheld such consent to cause the failure of the "exit strategy" and further cause economic harm to Harris.  TLS did so in retaliation for Harris' decision to discontinue the "U.S. Possession strategy".

81.    The "exit strategy" prepared for Plaintiffs did not cause any economic impact on TLS.  However, TLS' actions to avoid its implementation will cause Harris a taxable event which was meant to be avoided.  This impact is computed at no less than $200,000.

82.    In breach of the Services Agreement, TLS has failed to issue the corresponding tax forms, so Harris may pay taxes accordingly.  As a result, TLS has breached its fiduciary duty in preventing Harris from complying with applicable tax obligations.

83.    TLS also caused Harris to waste all the resources he spent in preparing the "exit strategy" because TLS arbitrarily declined to allow its implementation. This amounts to approximately $10,000.

84.    Because Harris would not have had to pay any tax moneys had TLS followed the "exit strategy", TLS is liable for all tax payments Harris would have avoided otherwise.  It is also liable for the costs of preparing such "exit strategy" which TLS, maliciously rejected just to penalize Harris for his decision not to continue utilizing TLS' services.

**PRAYER FOR RELIEF**

Based on the foregoing, it is respectfully requested from the Court that the instant Complaint be granted and that TLS be ordered to pay Plaintiffs no less than $510,000, plus interests, together with costs and attorney's fees.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 25th day of May 2018.

S/LYDIA M. RAMOS CRUZ
LYDIA M. RAMOS CRUZ
USDC/PR 214104
1509 López Landrón
American Airlines Bldg., PH
San Juan, Puerto Rico 00911
Email: lramos@rccrlegal.com
Phone: (787) 508-2525

*Exhibit A*



**TLS Management and Marketing Services, LLC**
270 Munoz Rivera Avenue, PH-1
San Juan, PR 00918

Services Agreement

THIS AGREEMENT is entered into on *March 27, 2014* by and between Harris Hospice, Inc. ("Client"), and TLS Management and Marketing Services, LLC ("TLS"), (collectively the "Parties") for the sole purpose of Client utilizing TLS to provide Business Services as hereinafter described.

Scope of Services

(1) TLS will provide to Client the services itemized in Appendix A ("Business Services"). In order to provide Business Services, TLS will:
   (a) Deploy appropriately skilled resources as are reasonably needed in order to provide Business Services, including:
      (i) Full-time or full-time-equivalent personnel who are dedicated to Client, including TLS employees, employees of TLS affiliates, and individuals who were formerly employed by Client (if applicable) and that have become employees of TLS or TLS affiliates (collectively, "Division Employees");
      (ii) Personnel who are not dedicated full-time to Client, but whose support is also reasonably needed in order to provide Business Services ("TLS Employees").
   (b) Assume responsibility for service agreements between Client and third parties with whom Client currently has a relationship, or create new relationships either directly between TLS and such existing third parties or with other third party providers including Client, as TLS deems reasonably necessary in order to effectively provide Business Services (collectively, "Division Contractors").
   (c) Division Employees, TLS Employees and Division Contractors shall be collectively referred to as "Division Resources".
(2) Out of the Professional Fees that Client has paid to TLS, TLS will allocate or charge to Client's TLS Division the following as TLS Division Costs:
   (a) The cost of Division Employees, including but not limited to:
      (i) The compensation being paid to Division Employees by TLS, including applicable payroll-related taxes, insurance, employee benefits, and any other legally required payments made for or on behalf of Division Employees;
      (ii) If Division Employees utilize TLS office facilities:
         (1) The cost of office accommodation that is made available, whether on a full-time or part-time basis, including a furnished office or workstation;
         (2) The cost of computer and office equipment, computer software, internet service, local and long distance business telephone service, cellular service, and office supplies (collectively, "Employee Supplies").
      (iii) Recruiting fees and associated expenses incurred at the reasonable discretion of TLS, if applicable.
      (iv) Relocation and temporary housing expenses, if applicable.
   (b) The cost of any Division Contractors.
   (c) The Fees and Allocated Expenses as defined in Appendix B.
   (d) All other reasonable and necessary direct expenses associated with providing Business Services, including reasonable and necessary travel expenses incurred by Division Resources while providing Business Services to Client.
(3) TLS will provide the following additional services to Client:
   (a) Issue to Client's designees ("TLS Members") a separate TLS unit class ("TLS Division") with all such units being owned by TLS Members. Business Services shall be provided to Client from, by and through the TLS Division or a subsidiary that is wholly owned by the TLS unit class.
   (b) Handle accounting matters for the TLS Division.
   (c) If the structure of TLS' US Possession business activities is challenged by any third party or governmental authority, TLS will defend the TLS Division concurrent with and to the extent of any TLS defense of such challenge against TLS.
(4) Client will be responsible for
   (a) Providing to Division Resources:
      (i) An appropriate level of support, guidance, training and feedback in conducting and fulfilling their day-to-day responsibilities in providing the agreed upon Business Services to Client.
      (ii) When working from Client's location, a workstation and other appropriate and necessary equipment and supplies to enable such Division Resources to properly perform Business Services.
   (b) Integrating Business Services into Client's other business operations.
   (c) Payment of any taxes, whether income, payroll or otherwise, due by Client or TLS Division ("Applicable Taxes").

2

(d) All legal and compliance matters related to the offering of products or services for which Business Services is involved. Client agrees to indemnify and hold TLS harmless for all such matters.

**Professional Fees**

(1) For Business Services rendered under this Agreement, Client shall pay to TLS the following fees ("collectively, Professional Fees"):
   (a) During the Design Phase, a one-time fee of $75,000. The Design Phase shall conclude upon mutual agreement between TLS and Client that the tasks required during the Design Phase have been completed and that TLS is ready to move into the Implementation Phase.
   (b) A monthly fee of $36,112.
   (c) Reimbursement for all TLS Division Costs.
(2) Other Financial Matters:
   (a) Professional Fees are due and payable on the first day of any calendar month or portion thereof during which TLS will be providing Business Services ("Due Date"). If Client fails to pay all Professional Fees by the Due Date, Division Resources and other costs of Client's Division will be paid out of TLS Division's Retained Earnings, r not paid if in TLS' reasonable judgment the TLS Division's Retained earnings are not sufficient, and no further dividends, loans, or withdrawals of any kind will be available to TLS Members until Client becomes current on all Professional Fees.
   (b) All payments of Professional Fees, and all disbursements made on behalf of Client, shall be made by ACH or wire transfer to or through a bank account designated by TLS.
   (c) TLS Members will be entitled to receive dividends or will have the ability to take loans from the TLS Division, based upon their TLS Division's Retained Earnings, in accordance with TLS' Dividend Policy or TLS' Loan Policy.

**Confidentiality**

(1) Neither TLS nor Client will directly or indirectly disclose to others any confidential information of the other Party, including but not limited to this Agreement. The Parties may only use confidential information of the other Party for a purpose that is necessary for carrying out the provisions of this Agreement.
(2) Client acknowledges, understands, and agrees that any TLS work product related to the delivery of Business Services including but not limited to (i) information regarding the structure of TLS and of any entities formed in connection with this Agreement, (ii) all agreements between the Parties, including this Agreement, (iii) all agreements with any third parties utilized in connection with this Agreement, and (iv) any other implementation-related documents (collectively, "TLS Reports") contain copyrighted material and are considered to be intellectual property of TLS. Client agrees not to violate TLS' copyright or trademark relative to TLS Reports, and agrees not to disclose, copy or provide, in whole or in part, the contents of TLS Reports to any third party, including but not limited to Client's financial, accounting and legal advisors (collectively, "Client Advisors"). Client acknowledges that it is Client's responsibility, and not TLS' responsibility, to ensure that a Client Advisor signs the standard TLS confidentiality agreement ("Advisor Confidentiality Agreement"). TLS believes this transaction is proprietary and exclusive; however, notwithstanding any and all contrary or other provisions within this agreement, in accordance with IRC Section 6011 or such successor or other IRC sections, TLS confirms that there is no limitation on disclosure of the tax treatment or tax structure of the transaction. This tax treatment disclosure, however, does not allow the violation of TLS' trademark or copyright, nor the disclosure of any unique, proprietary and copyrighted materials including TLS Reports to third parties.
(3) Client acknowledges, understands, and agrees that a US Possession Company will be implemented for Client only by TLS or a TLS affiliate, and that implementation of a US Possession Company for Client Control Group by Client or any other third party shall be considered a breach of this Agreement. Furthermore, TLS shall not be responsible for any financial or other consequences or consequential damages that may result from the improper implementation of a US Possession Company by any other third party including Client Advisors.
(4) Client agrees that it shall not at any time during or for a period of two years after the termination of this Agreement, through itself or through any entity controlling, controlled by, related to, or under common control with Client, directly or indirectly ("Client Control Group"), develop or utilize the same or similar structures to those provided through this Agreement ("Similar Services") nor shall Client Control Group obtain Similar Services from any other source. Should Client Control Group do so in violation of this provision, Client or Client Control Group will be liable to TLS for all Management Fees and Allocated Expenses that would have otherwise been due to TLS had TLS itself provided such services to those parties for a period of two years with no annual maximum for the Management Fee (collectively, the



3

"Settlement Fee"), plus all costs incurred by TLS to enforce this agreement. The Settlement Fee shall be computed based on the maximum Management Fees and Allocated Expenses actually paid to TLS during any 24 month period in which Client was obtaining Business Services from TLS under this Agreement or any successor agreement. If an agreement between the parties for Business Services has been in place for less than 24 months, the applicable Settlement Fee shall be the total Management Fees and Allocated Expenses actually paid to TLS extrapolated to a full 24 month period. This remedy is not the sole and exclusive remedy available to TLS and such amount which would be payable to TLS is not as liquidated damages and is in partial consideration for TLS implementing this US Possession Company structure for Client. Client further agrees not to utilize any TLS third party professionals and not to hire or utilize any Division Resources to whom Client has been introduced, may be introduced to, or becomes aware of, by or through TLS or any TLS professionals or advisors.

(5) The Parties recognize and acknowledge that irreparable damage without an adequate remedy at law may result from a breach of the provisions of this Agreement. The Parties therefore agree that, in addition to any and all other remedies available to them, they may apply for and be entitled to a restraining order, injunction, decree of specific performance, or other equitable relief as may be decreed or issued by a court of competent jurisdiction to enforce the provisions of this Agreement to restrain the other Party from such breach without the necessity of posting bond. Either Party, if forced to seek equitable remedies, may obtain such relief without the necessity of posting a bond.


Termination

(1) The initial term ("Initial Term") of this agreement shall be one year, and shall commence on the date hereof. This Agreement shall automatically renew for successive twelve month periods (each a "Renewal Term") unless, at least ninety days prior to the expiration of the Initial Term or ninety days prior to the expiration of any Renewal Term (the "Termination Period"), either Party gives written notice to the other Party specifically electing to terminate this Agreement effective as of the end of the Initial Term or at the end of any such Renewal Term. The latter of (i) the ninetieth day after written notice has been provided to TLS, or (ii) the date on which TLS has received all required termination documentation back from Client, shall be referred to as the Termination Date. Professional Fees shall be due and payable to TLS through the Termination Date.

(2) Effect of Termination.
   (a) TLS Members will return to TLS all TLS Divison units and documents that have been issued or provided to TLS Members.
   (b) Client and/or TLS Members will be responsible for the following costs, which shall collectively be referred to as "Termination Costs":
      (i) TLS Division Costs incurred during the Termination Period in the normal course of the TLS Division's business, including but not limited to Fees and Allocated Expenses itemized in Appendix B, and any accrued interest payable in accordance with TLS' Loan Policy.
      (ii) The remaining term of any agreements with Division Contractors that TLS has entered into in order to provide Business Services. Client shall accept assignment of any such agreements and any obligations related thereto.
      (iii) Subsequent compensation to any Division Employees that will, as a result of termination of this Agreement, be terminated by TLS and hired by Client.
      (iv) TLS Members shall each pay a termination fee equal to the Minimum Management Fee, and any other applicable termination expenses, including but not limited to expenses from third parties that are necessary in order to close the TLS Division, and any legally required payments to Division Employees who are terminated as a result of termination of this Agreement (collectively, "Termination Fees").
   (c) If Client terminates but fails to give the required notice as stipulated in this Agreement, the Termination Costs shall also include, in addition to the above costs, an Early Termination Fee payable to TLS equal to the sum of the highest three individual months, consecutive or non-consecutive, of Management Fees and Allocated Expenses actually paid by Client to TLS during the twelve month period prior to receipt by TLS of Client's notice of termination.
   (d) Payment of Termination Costs shall be made out of any Client-related funds paid to or on deposit with TLS including the TLS Division's Retained Earnings. If TLS Division's Retained Earnings are insufficient to cover such costs, Client shall pay to TLS any Termination Costs in excess of TLS Division's Retained Earnings on the earlier of ten days after notice by TLS or the Termination Date.
   (e) After payment of all Termination Costs, TLS shall return to TLS Members any amount that remains of the TLS Division's Retained Earnings that are related to each of the TLS Members within 30 days after the Termination Date, and prepare and issue all applicable tax forms to TLS Members for the amount refunded, by the applicable government deadlines.

(3) Termination Due to Breach.



4

(a) In the event that either Party is in material breach of this Agreement, with material breach to include (a) a situation in which, as a result of Client's actions or inactions, TLS is unable to provide the Business Services outlined in this Agreement, (b) Client failure to pay the applicable Professional Fees by the Due Date, (c) if TLS and Client are unable to reasonably agree on any Professional Fees left indeterminate in this Agreement by such time as agreement is required by this Agreement, (d) Client failure to give proper and timely notice of termination, or (e) TLS failure to provide Business Services in reasonable accordance with this Agreement; then the non-breaching Party may initiate steps to terminate this Agreement by giving the other Party written notice describing the breach. If the breaching Party (a) does not within thirty days ("Cure Period") of receiving such notice in accordance with the Notices section of General Provisions, cure such breach in the reasonable judgment of the non-breaching Party, or (b) if such breach is incapable of cure in thirty days and if the breaching party does not commence within thirty days commercially reasonable efforts to cure such breach and pursue such efforts diligently (provided the breach shall in any event be cured within sixty days ("Extended Cure Period")), then the Agreement shall terminate at the end of the applicable cure period without need of further action by either Party other than as stipulated herein.

(b) If termination occurs as a result of Client's material breach of this Agreement:
    (i) The Termination Period shall be considered to be the Cure Period or Extended Cure Period as applicable, and the Termination Date shall be considered to be the end of the applicable cure period.
    (ii) Client shall be responsible for all Termination Costs.

(c) If termination occurs as a result of TLS' material breach of this Agreement:
    (i) The Termination Period shall be considered to be the Cure Period or Extended Cure Period as applicable, and the Termination Date shall be considered to be the end of the applicable cure period.
    (ii) TLS shall be responsible for all Termination Fees.

(4) This Agreement shall terminate immediately if either Party (a) fails to perform or observe its obligations under the Confidentiality sections of this Agreement, which shall survive the termination of this Agreement for any reason; or (b) files a petition for bankruptcy, or fails to continue to operate as a going concern.

## General Provisions

(1) *Indemnification.* The Parties shall indemnify and hold each other harmless from and against any and all claims, whether or not covered by insurance, caused or asserted to have been caused, directly or indirectly, by or as a result of the performance of any intentional acts, negligent acts or omissions of either Party and/or its officers, directors, shareholders, members, agents, employees and/or subcontractors in connection with the performance by the Parties of their obligations under this Agreement.

(2) *Equitable Remedies.* The Parties recognize and acknowledge that irreparable damage without an adequate remedy at law may result from a breach of this Agreement, including without limitation any actual or threatened use of Confidential Information in any manner that is not in accordance with this Agreement. Each Party agrees that the other Party, in addition to any and all other remedies available, may apply for and be entitled to a restraining order, injunction, decree of specific performance, or other equitable relief as may be decreed or issued by a court of competent jurisdiction to enforce the provisions of this Agreement and to restrain the other Party from such breach and/or from rendering any services to any person, firm, or entity in breach of this Agreement. Either Party, if forced to seek equitable remedies, may obtain such relief without the necessity of posting a bond. Client agrees to pay all legal fees and costs of TLS if a preliminary or permanent injunction is ordered due to the actions or inactions of Client, and TLS agrees to pay all legal fees and costs of Client if a preliminary or permanent injunction is ordered due to the actions or inactions of TLS.

(3) *Severability.* If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

(4) *Successors and Assigns.* This Agreement shall be binding upon and inure to the benefit of, and be enforceable by, the Parties as well as their respective successors and permitted assigns. Neither this Agreement nor any part hereof shall be assigned by either Party without the prior written consent of the other Party, and such written consent shall not be unreasonably withheld. Nothing in this Agreement, expressed or implied, is intended to confer any person, other than the Parties and their successors, any rights or remedies under or by reason of this Agreement.

(5) *Waivers.* The failure of any Party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

(6) *Counterparts.* This Agreement may be executed in counterparts, each of which when executed and delivered will be deemed to be an original, and all of which taken together will constitute one and the same agreement.



5

(7) *Entire Agreement; Amendments.* This Agreement contains the entire agreement of the Parties relating to the subject matter hereof. All previous agreements or working arrangements between the Parties relative to the subject matter herein, whether in writing or oral, shall be superseded and terminated as of the date hereof. Except as otherwise provided herein, this Agreement may not be changed orally, but only by an agreement in writing signed by the Party against whom enforcement of any change, waiver, modification, extension or discharge is sought.

(8) *Rights and Remedies Cumulative.* The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any Party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the Parties may have.

(9) *Notices.* Any notices or other communications required or permitted under this Agreement shall be sufficiently given if delivered personally, or if sent by courier service or registered or certified mail, to the addresses below or to any other address furnished in writing by one Party to the other, and shall be deemed to have been given as of the date mailed to the receiving Party by courier service or registered or certified mail. The failure or refusal of any Party to accept any notice given pursuant to this paragraph shall be conclusively deemed receipt thereof and knowledge of its contents.

If to TLS:        TLS Management and Marketing Services, LLC
                  270 Munoz Rivera Avenue, PH-1
                  San Juan, PR 00918

If to Client:     Harris Hospice, Inc.
                  522 S Edmonds Lane, Suite 103
                  Lewisville, TX 75067

(10) *Representations and Warranties.* Each Party represents and warrants to the other Party that: (a) it has (and the persons signing on its behalf have) the authority and power to enter into this Agreement and that all actions necessary to authorize, approve, execute, and perform this Agreement have been taken; and (b) in performing its obligations under this Agreement it will comply with all laws, regulations, and policies of any agency having jurisdiction.

(11) *No Warranty.* Client acknowledges that TLS has not made and will not make any express or implied warranties or representations that the services provided by TLS will result in any particular amount or level of business or income to Client. Nothing herein, however, shall excuse TLS from the timely and satisfactory performance of its duties hereunder.

(12) *Additional Documents.* Each of the parties agrees to execute any document or documents that may be reasonably requested from time to time by the other party to implement or complete such party's obligations pursuant to this Agreement.

(13) *Contract Modifications for Prospective Legal Events.* If any laws or regulations, now existing or enacted or promulgated after the effective date of this Agreement, are interpreted by judicial decision, a regulatory agency or TLS legal counsel in such a manner as to indicate that the structure of this Agreement may be in violation of such laws or regulations, or potentially conflicts with such interpretations of the Internal Revenue Code or other equivalent authority, Client and TLS agree to amend or modify and shall amend or modify this Agreement as is necessary in order to comply with such laws or regulations. To the maximum extent possible, any such amendment shall preserve the underlying economic and financial arrangements between Client and TLS.

(14) *Facsimile Signatures.* Facsimile signatures on notices and amendments are the equivalent of original signatures.

(15) *Governing Law.* This Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the Commonwealth of Puerto Rico where exclusive venue shall reside, and shall be deemed to have been executed in that domicile.

IN WITNESS WHEREOF, the Parties have executed this agreement on the date first written above.

TLS Management and Marketing Services, LLC          Harris Hospice, Inc.

By: _____                               By: _____

Print Name: _Ricky Rodriguez_                       Print Name: _Joy Harris_

Title: _Managing Director_                           Title: _President_

6

Appendix A:
Business Services

In accordance with the service agreement TLS will provide the following Services:

Marketing Services

1)  TLS will perform a competitive analysis study of three companies. These three companies will include Harris Healthcare, Inc., Hospice Plus and Vitas. The study will include all digital venues, website, google, social media platforms and published news and creative. The process may include research calls per each service provider to solicit additional information. Main areas to cover are:

    a)  Location
    b)  Price for services
    c)  Competitive advantage
    d)  Services
    e)  Brand and brand promise
    f)  Target market
    g)  Communications efforts

    TLS will deliver the competitive analysis in the form of a power point presentation that will include one specific section per company and a comparison table at the end. Each report will include closing remarks and recommendations.

2)  TLS will review the digital marketing efforts in order recommend ways to improve the web image and the look and feel of the client's web presence.

3)  TLS will review conditions that may increase the traffic to the client's webpage.

4)  TLS will create a monitoring process for tracking traffic with analytics of the company's webpage.



7

Appendix B:
*Fees and Allocated Expenses*

Client understands, acknowledges, and agrees that, out of any Professional Fees paid to TLS by Client, and prior to payment of any other TLS Division Costs, TLS will be entitled to receive and retain:

(1) Set-up Fee:
    (a) The one-time Set-up Fee shall be equal to $25,000.

(2) Management Fee:
    (a) The Management Fee shall be equal to the greater of $25,000 ("Minimum Management Fee") or ten percent (10%) of the calendar year-to-date Gross Profit of the TLS Division less the Allocated Expenses described below, to a maximum of $100,000 per calendar year per TLS Division that is required to be established. It is recognized and understood that a single TLS Division cannot charge Client as Professional Fees, as a guideline, an amount in excess of 20% of a Client's Gross Revenues.
    (b) The Minimum Management Fee is due and payable to TLS on the date of this Agreement, and again on January 1 of each subsequent calendar year or portion thereof in which TLS is providing Business Services under this Agreement or any successor agreement. No additional Management Fees beyond the Minimum Management Fee will be owed in a calendar year, until the Gross Profit of the TLS Division has exceeded $250,000 in that calendar year.

(3) Allocated Expenses, which shall consist of two components:
    (a) The tax component ("Applicable Taxes") shall be equal to the statutorily required taxes of any kind, including 4% of the Net Income of the TLS Division for income taxes, plus any other applicable municipal, payroll, property or other taxes.
    (b) The Employee Component shall be equal to the greater of $25,000 ("Minimum Employee Component") or six percent (6%) of the calendar year-to-date Gross Profit of the TLS Division, to cover certain costs and expenses of TLS Employees who are providing Business Services to Client.
    (c) The Minimum Employee Component is due and payable to TLS as follows:
        (1) In an amount pro-rated through the end of the initial calendar year ("Pro-Rated Employee Component"), on the date of this Agreement. No additional Employee Component beyond the Pro-Rated Employee Component will be owed in the initial calendar year, until 6% of the Gross Profit of the TLS Division exceeds the Pro-Rated Employee Component.
        (2) In full, on the first day of each subsequent calendar year or portion thereof in which TLS is providing Business Services under this Agreement or any successor agreement. No additional Employee Component beyond the Minimum Employee Component will be owed in each subsequent calendar year until 6% of the Gross Profit of the TLS Division exceeds the Minimum Employee Component.

(4) If Client advises TLS at least ninety days prior to the expiration of the Initial Term or ninety days prior to the expiration of any Renewal Term that, during the subsequent Renewal Term, Client does not desire Business Services and does not intend to pay Professional Fees but desires to keep the TLS Division in place ("Suspension of Service"), an annual Compliance Fee equal to the greater of (a) $10,000 or (b) 1% of the TLS Division's Retained Earnings at the end of the last complete calendar month during the current term up to a maximum of the Minimum Management Fee, shall replace the Management Fees and Allocated Expenses that would otherwise be due and payable to TLS under this Agreement. A Suspension of Service shall only be allowed if Client is current on all financial obligations related to this Agreement. The Compliance Fee will be due on the first day of the applicable Renewal Term. Any reasonable and necessary TLS Division Costs, including any payments related to investments of the TLS Division, shall be due and payable as incurred. If after requesting a Suspension of Service, Client desires to reactive Business Services, a Set-Up Fee of $10,000 will be due and payable to TLS.



*Exhibit B*

7:46 PM
12/10/15

# Harris Hospice Inc.
## Checks for TLS Mgt. and Marketing Services, LLC
### All Transactions

| Num | Date | Account | Amount |
|-----|------|---------|--------|
| | 09/18/2014 | Checking | 87,655.00 |
| | 08/14/2014 | Checking | 87,655.00 |
| | 06/17/2014 | Checking | 87,655.00 |
| | 06/03/2014 | Checking | 87,655.00 |
| | 05/29/2014 | Checking | 39,198.00 |
| | 05/27/2014 | Checking | 100,000.00 |
| | 04/30/2014 | Checking | 36,112.00 |
| | 03/27/2014 | Checking | 111,112.00 |
| Total | | | 637,042.00 |

*Exhibit C1*

# TLS Management and Marketing Services LLC
## LOAN PROGRAM APPLICATION

### SECTION I - INDIVIDUAL INFORMATION

Name: Jay Harris      Driver's License: 00358504

DOB: 05/28/1957    SS#: 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   E-mail: jay@harrishospice.com

Phone: 9404841925   Phone 2: 4696820264

Home Address: 2221 Hollyhill Lane

| City: Denton | State: TX | Zip Code: 76205 |
| Home: (Own) Rent (Circle) | Monthly PMT: NA | How long? 7yrs |

Prior Home Address (if above is less than 2yrs):

| City: | State: | Zip Code: |
| Home: Own Rent (Circle) | Monthly PMT: | How Long? |

Civil Status (Married) Single, Widowed):

Name of a relative that does not live with you: Julia Harris-Aleman    Phone: 940-594-9334

Address: 1009 MuirWoods Dr

City: Allen    State: TX    Zip Code: 75002

Relation to you:

### SECTION II - ENTITY INFORMATION

Entity Name:      Date of Formation:

State of Formation:      FEIN:

Entity Type:

Address:

| City: | State: | Zip Code: |
| Phone: | E-mail: | Fax: |

Principal 1:

Address:

City:    State:    Zip Code:

Principal 2:

Address:

City:    State:    Zip Code:

Principal 3:

Address:

City:    State:    Zip Code:

### SECION III - LOAN INFORMATION

Loan Purpose: Investments + Expenses

Disbursement frequency: (Monthly) Quarterly Annual (Circle one)

Other Information:

### SECTION IV - TLS OWNERSHIP INFORMATION

Name of TLS entity ownership: TLS Management and Marketing Services

Share Class: Class T      TLS SH Since: March 27, 2014

1

Rev.6.30.13

# TLS Management and Marketing Services LLC
## LOAN PROGRAM APPLICATION

Other Information:    *N/a*

### SECTION V - OTHER QUESTIONS

Have you used as collateral your ownership within TLS for any purpose? Yes / No (If yes, please provide information)    *No*

Have you ever declared bankruptcy? (If yes, please explain)    *No*

Have you ever been convicted of a felony? (If yes, please explain)    *No*

Are you currently included in a lawsuit against you or your entity above? (If yes, please explain)    *No*

### SECTION VI - SIGNATURE

I declare under penalty of perjury that the information in this form has been provided by me and that the same is true, correct and complete. Similarly I authorize TLS to verify information on this form and obtain a credit report in order to obtain a credit facility under the TLS Loan Program.

*Jay Harris*

Applicant or Authorized Agent Signature (if entity provide name & position)

Date    *4/1/14*

---

### FOR OFFICE USE ONLY

Expected RE Balance at year end: *5 years* *$1,195,000*    Approved LTV: *75%*

Loan Term: *5 years*    Interest (AFR): *2.66% (2.16 + .50)*

Approved annual amount: *TBD (Financials)*

Expected disbursement amount depending on frequency requested: *Monthly*

TLS Officer Signature

Date *4/1/14*

Rev.6.30.13

*Exhibit C 2*

## SECURITY AGREEMENT

This Security Agreement is entered into on the 1 day of April, 2014, between Jay Harris *(the Debtor)*, of 2221 Hollyhill Lane, Denton County, State of Texas, and TLS Management and Marketing Services, LLC (the Secured Party), of 270 Muñoz Rivera Avenue, PH-1, City of San Juan, Commonwealth of Puerto Rico, as follows:

For value received, the Debtor grants to the Secured Party a security interest in the following described property (the Collateral) and 100% membership interest in Class T Shares of TLS Management and Marketing Services, LLC, and all uses of such Collateral as well as additional after acquired interest in TLS Management and Marketing Services, LLC to secure (1) the promissory note ("Note") of $1,200,000 to the Secured Party as of April 1, 2014, payable as to principal and interest as provided in the Note; (2) future advances by the Secured Party to the Debtor, to be evidenced by similar notes; (3) all expenditures by the Secured Party for taxes, insurance, and repairs, if any, to and maintenance of the Collateral incurred by Secured Party in the collection and enforcement of the Note and other indebtedness of Debtor; and (4) all liabilities of Debtor to Secured Party now existing or incurred in the future, matured or un-matured, direct or contingent, and any renewals, extensions, and substitutions of those liabilities.

The Debtor warrants, covenants, and agrees as follows:

### Title

1.      Except for the security interest granted by this agreement, the Debtor has, or on acquisition will have, full title to the Collateral free from any lien, security interest, encumbrance, or claim, except prior claims of record and the Debtor will, at the Debtor's cost and expense, defend any action that may affect the Secured Party's security interest in, or the Debtor's title to, the Collateral.

### Financing Statement

2.      The Debtor will join in executing all necessary Financing Statements in forms satisfactory to the Secured Party and will further execute all other necessary instruments deemed necessary by the Secured Party.

### Sale, Lease or Disposition of Collateral

3.      The Debtor will not, without the written consent of the Secured Party, sell, contract to sell, lease, encumber, or dispose of the Collateral or any interest in it until this Security Agreement and all debts secured by it have been fully satisfied.

### Term

Page 1

4. The loan shall have a term included within such loan documents that this instrument secures. The loan shall be evidenced by a Note executed by the Debtor, dated as of **April 1, 2014**, the date hereof, and payable to the order of the Secured Party.

### Protection of Collateral

5. The Debtor will keep the Collateral in good order.

### Taxes

6. The Debtor will pay promptly when due all taxes and any assessments on the Collateral.

### Security Interest in Proceeds and Accessions

7. The Debtor grants to the Secured Party a security interest in and to all proceeds, increases, substitutions, replacements, additions, and accessions to the Collateral. This provision shall not be construed to mean that the Debtor is authorized to sell, lease, or dispose of the Collateral without the consent of the Secured Party.

### Decrease in Value of Collateral

8. The Debtor shall, if in the Secured Party's judgment the Collateral has materially decreased in value or if the Secured Party shall at any time deem that the Debtor is financially unstable, either provide enough additional Collateral to satisfy the Secured Party or reduce the total indebtedness by an amount sufficient to satisfy the Secured Party. If the loan exceeds the approved ___ % loan to value ("LTV") related to the collateral, the Debtor shall repay the Secured Party any amount necessary to return the LTV to the approved percentage or obtained a written statement from the Secured Party allowing a greater LTV that the one initially approved.

### Reimbursement of Expenses

9. At the option or the Secured Party, the Secured Party may discharge taxes, liens, interest, or perform or cause to be performed for and on behalf of the Debtor any actions and conditions, obligations, or covenants that the Debtor has failed or refused to perform, and may pay for the repair, maintenance, and preservation of the Collateral. All sums so expended, including but not limited to attorneys' fees, court costs, agent's fees, or commissions, or any other costs or expenses, shall bear interest from the date of payment at the annual rate of eight percent and shall be payable at the place designated in the Note and shall be secured by this Security Agreement.

### Payment

10. The Debtor will pay the Note secured by this Security Agreement and any renewal or extension of it and any other indebtedness secured by this agreement in accordance with the terms and provisions of the indebtedness and will repay immediately all sums expended by the Secured Party in accordance with the terms and provisions of this Security Agreement.

Page 2

## Change of Residence or Place of Business

11.    The Debtor will promptly notify the Secured Party of any change of the Debtor's residence, chief place of business, or place where records concerning the Collateral are kept.

## Attorney-in-Fact

12.    The Debtor appoints the Secured Party as the Debtor's attorney-in-fact to do any and every act that the Debtor is obligated by this Security Agreement to do, and to exercise all rights of the Debtor in the Collateral and to make collections and to execute any and all papers and instruments and to do all other things necessary to preserve and protect the Collateral and to make collections and to protect the Secured Party's security interest in the Collateral.

## Time of Performance and Waiver

13.    In performing any act under this Security Agreement and the Note secured by it, time shall be of the essence. The Secured Party's acceptance of partial or delinquent payments, or the failure of the Secured Party to exercise any right or remedy, shall not be a waiver of any obligation of the Debtor or right of the Secured Party or constitute a waiver of any other similar default that occurs later.

## Default

14.    The Debtor shall be in default under this Security Agreement on the occurrence of any of the following events or conditions:

a.    Default in the payment or performance of any note, obligation, covenant, or liability secured by this Security Agreement.

b.    Any warranty, representation, or statement made or furnished to the Secured Party by or on behalf of the Debtor proves to have been false in any material respect when made or furnished.

c.    Any event that results in the acceleration of the maturity of the indebtedness of the Debtor to others under any indenture agreement, or undertaking.

d.    Loss, theft, substantial damage, destruction, sale, or encumbrance to or of any of the Collateral, or the making of any levy, seizure, or attachment of or on the Collateral.

e.    Any time the Secured Party reasonably believes that the prospect of payment of any indebtedness secured by this Security Agreement or the performance of this Security Agreement is impaired.

f.    The Debtor's death, the debtor's insolvency or business failure, the appointment of a receiver for any part of the Collateral, any assignment for the benefit of creditors, or the commencement of any proceeding under any bankruptcy or insolvency law by or against the Debtor or any guarantor or surety for the Debtor.

g.    Upon Debtor's withdrawal as a TLS Member.

## Remedies

15.    On the occurrence of any event of default, and at any later time, the Secured Party may declare all obligations secured due and payable immediately and may proceed to enforce payment and exercise any and all of the rights and remedies provided by Law or in Equity under the Commonwealth of Puerto Rico.

The Secured Party may require the Debtor to deliver Collateral and make it available to the Secured Party at any place to be designated by the Secured Party that is reasonably convenient to both parties. Expenses of retaking, holding, preparing for sale, selling, or the like shall include the Secured Party's reasonable attorneys' fees and legal expenses.

## Miscellaneous Provisions

16. a.    **Applicable Jurisdiction:** This Security Agreement shall be construed under and in accordance with the Laws of the Commonwealth of Puerto Rico, and the parties agree to submit themselves voluntarily to Puerto Rico's Court Of Law and its jurisdiction.

b.    **Parties Bound:** This Security Agreement shall be binding on and inure to the benefit of the parties and their respective heirs, executors, administrators, legal representatives, successors, and assigns as permitted by this Security Agreement.

c.    **Legal Construction:** In case any one or more of the provisions contained in this Security Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, the invalidity, illegality, or unenforceability shall not affect any other provision of this Security Agreement and this Security Agreement shall be construed as if the invalid, illegal, or unenforceable provision had never been contained in it.

d.    **Prior Agreements Superseded:** This Security Agreement constitutes the only agreement of the parties and supersedes any prior understandings or written or oral agreements between the parties respecting the subject matter of this Security Agreement.

Both parties voluntarily sign this Security Agreement after having the opportunity to go over it in detail, and with the knowledge that all that has been discussed and agreed upon between the parties has been construed accordingly in this Security Agreement.

SECURED PARTY:

TLS Management and Marketing
Services, LLC

DEBTOR:

Jay Harris

Page 4

TLS Security Agreement
V.4

*Exhibit C3*

# LINE OF CREDIT PROMISSORY NOTE

**PRINCIPAL: $1,200,000**

FOR VALUE RECEIVED, Jay Harris, ("Borrower") promises to pay to the order of TLS Management and Marketing Services, LLC ("Lender"), a Commonwealth of Puerto Rico Limited Liability Company, the principal sum of One Million Two Hundred Thousand Dollars ($1,200,000), or so much thereof as may be disbursed to, or for the benefit of the Borrower by Lender in Lender's sole and absolute discretion. It is the intent of the Borrower and Lender hereunder to create a line of credit agreement between Borrower and Lender whereby Borrower may borrow up to $1,200,000 from Lender; provided, however, that Lender has no obligation to lend Borrower any amounts hereunder and the decision to lend such money lies in the sole and complete discretion of the Lender.

**INTEREST & PRINCIPAL:** The unpaid principal of this line of credit shall bear compound interest at the rate of **2.66%** per annum. Interest shall be calculated based on the principal balance as may be adjusted from time to time to reflect additional advances made hereunder. Interest on the unpaid balance of this Note shall accrue monthly and shall be payable on the loan's yearly anniversary. The principal balance of this Note shall be due and payable on **March 31, 2019.** There shall be no penalty for early repayment of all or any part of the principal.

**SECURITY:** This Note shall be secured by a secured interest upon certain property owned by the Borrower and described as **100%** of **Class T** membership interest. **Class T** represents **.02%** membership interest in TLS Management and Marketing Services, LLC.

**DEFAULT:** The Borrower shall be in default of this Note on the occurrence of any of the following events: (i) the Borrower shall fail to meet its obligation to make the required principal or interest payments hereunder. (ii) the Borrower shall be dissolved or liquidated; (iii) the Borrower shall make an assignment for the benefit of creditors or shall be unable to, or shall admit in writing their inability to pay their debts as they become due; (iv) the Borrower shall commence any case, proceeding, or other action under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors, or any such action shall be commenced against the undersigned; (v) the Borrower shall suffer a receiver to be

appointed for it or for any of its property or shall suffer a garnishment, attachment, levy or execution; (vi) the Borrower shall withdraw as a TLS Member for any reason

**REMEDIES:** Upon default of this Note, Lender may declare the entire amount due and owing hereunder to be immediately due and payable. Lender may also use all remedies in law and in equity to enforce and collect the amount owed under this Note.

Borrower hereby waives demand, presentment, notice of dishonor, diligence in collecting, grace and notice of protest.

BORROWER:

Jay Harris
2221 Hollyhill Lane
Denton, TX  76205

LENDER:

TLS Management and Marketing Services, LLC
270 Muñoz Rivera Avenue, PH-1
San Juan, PR 00918

### TLS Management and Marketing Services LLC
### Balance Sheet - Class T
#### As of July 31, 2015

|  | Class T (Puerto Rico Division) |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Class T Checking #6197 | 108,844.83 |
| **Total Checking/Savings** | 108,844.83 |
| | |
| **Other Current Assets** | |
| Prepaid Minimum Fees | |
| Management Fees | 5,833.31 |
| **Total Prepaid Minimum Fees** | 5,833.31 |
| | |
| Accrued Interest Receivable | 10,747.00 |
| Due from Members | 10.00 |
| **Total Other Current Assets** | 16,590.31 |
| | |
| **Total Current Assets** | 125,435.14 |
| | |
| **Other Assets** | |
| Note Receivable | |
| Class T | 371,000.00 |
| **Total Note Receivable** | 371,000.00 |
| | |
| **Total Other Assets** | 371,000.00 |
| | |
| **TOTAL ASSETS** | 496,435.14 |
| | |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| Other Current Liabilities | |
| Due to Other Divisions | 159.00 |
| Accrual for Minimum Fees | |
| Accrued Minimum Fees | |
| Management Fees | 5,833.31 |
| **Total Accrued Minimum Fees** | 5,833.31 |
| | |
| **Total Accrual for Minimum Fees** | 5,833.31 |
| | |
| **Total Other Current Liabilities** | 5,992.31 |
| | |
| **Total Current Liabilities** | 5,992.31 |

TLS Management and Marketing Services  LLC
Balance Sheet - Class T
As of July 31, 2015

|  | Class T (Puerto Rico Division) |
|---|---|
| Total Liabilities | 5,992.31 |
| | |
| **Equity** | 10.00 |
| Class T - Equity | 480,947.44 |
| Retained Earnings | 9,485.39 |
| Net Income | 490,442.83 |
| Total Equity | |
| | |
| TOTAL LIABILITIES & EQUITY | 496,435.14 |

November 18, 2014

TLS Management and Marketing Services, LLC
270 Munoz Rivera Avenue, PH-1
San Juan, PR 00918

Dear Ricky Rodriguez,

I am writing to inform you that I am terminating our agreement effective March 26th, 2015. As per the provisions set forth in our agreement dated March 27th, 2014, page 3, under the heading Termination.

(1) The initial term of this agreement shall be one year, and shall commence on the date hereof. This Agreement shall automatically renew for successive twelve month periods (each a "Renewal Term") unless, at least 90 days prior to the expiration of the Initial Term or ninety days prior to the expiration of any Renewal Term (the "Termination Period"), either Party gives written  notice to the other Party specifically electing to terminate this Agreement effective as of the end of the Initial Term or at the end of any such Renewal Term.

My decision to terminate our agreement is no reflection on your excellent and professional staff.


Warm regards,

Jay Harris

Jay Harris


cc: Miller Davidge, Attorney

Exhibit E2

**Jay Harris**

| | |
|---|---|
| **From:** | Jay Harris [jay@harrishospice.com] |
| **Sent:** | Wednesday, December 03, 2014 9:39 AM |
| **To:** | 'Ricky Rodriguez' |

Ricky,

Thank for you call this morning. As per our conversation please place your services with our business on hold until further notice. Please do not terminate our agreement.

Jay Harris

1

Exhibit F

# TLS Management and Marketing Services  LLC
## Profit & Loss - Class T
### January through February 2015

|  | Jan - Feb 15 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Interest Income - Loan Program | 3,591.00 |
| **Total Income** | 3,591.00 |
| | |
| **Gross Profit** | 3,591.00 |
| | |
| **Expense** | |
| Loan Servicing Fee Expense | 317.00 |
| TLS Management Fee Exp | 10,000.00 |
| **Total Expense** | 10,317.00 |
| | |
| **Net Ordinary Income** | -6,726.00 |
| | |
| **Net Income** | -6,726.00 |

# HARRIS H HOSPICE
### INC.

June 24, 2015

**BY: CERTIFIED MAIL**

Mr. David A. Runge
*Manager*
**TLS Management and Marketing Services, LLC**
268 Munoz Rivera Avenue, Suite 1006
San Juan, PR 00918

Dear Mr. Runge:

I regret to inform you that due to conditions out of my control, I would like to terminate the Service Agreement signed with your company on March 27th, 2014. This termination is effective on June 30th, 2015.

I appreciate your assistance and understanding by activating the Suspension of Service condition on our agreement back in December 3, 2014, but our conditions have not changed and we are forced to terminate.

It has been a pleasure working with your team and I am grateful for the benefits obtained from your services.

Cordially,

Jay Harris
President

Cc. Miller Davidge, Esq.

522 South Edmonds Lane
Suite 103
Lewisville, TX 75067
Phone: 972.353.0800
Fax: 972.353.0811

www.harrishospice.com

Counties Served:
Collin, Dallas,
Denton, Grayson,
Kauffman, Rockwall,
NE Tarrant

# HARRIS H HOSPICE
### INC.

June 24, 2015

**BY: CERTIFIED MAIL**

Mr. David A. Runge
*Manager*
**TLS Management and Marketing Services, LLC**
268 Munoz Rivera Avenue, Suite 1006
San Juan, PR 00918

**Re: Assignment of Class T Interest**

Dear Mr. Runge:

My personal financial advisor has advised me that in order to prevent the sudden taxable event on my departure from TLS, I should assign the membership interest on TLS Management and Marketing Services, LLC Class T to a newly created LLC domiciled in Puerto Rico.

As you know, we are trying to be as effective as possible under the circumstances and this is our solution in order to achieve that. I appreciate your assistance in completing the assignment as soon as possible. Attached, please find the assignment document for which I will need your acknowledgement.

Thank you for your support.

Sincerely,

Jay Harris
Class T Member

522 South Edmonds Lane
Suite 103
Lewisville, TX 75067
Phone: 972.353.0800
Fax: 972.353.0811

www.harrishospice.com

Counties Served:
Collin, Dallas,
Denton, Grayson,
Kauffman, Rockwall,
NE Tarrant

# ASSIGNMENT OF INTERESTS

This Assignment of Interests (hereinafter "Assignment") is dated as of June 24, 2015, from JAY HARRIS (hereinafter "Assignor") to SANDPIPER, LLC, a Commonwealth of Puerto Rico limited liability company, (hereinafter "Assignee") each for now on named, a "Party," and collectively, the "Parties".

## RECITALS

**WHEREAS,** the Assignor is the only owner and holder of Class T interests (hereinafter "Interests") representing 0.10% interest in TLS Management and Marketing Services, LLC (hereinafter "TLS"), a Commonwealth of Puerto Rico limited liability company; and

**WHEREAS,** Assignor desires to transfer ownership of his membership interests in TLS to the Assignee, and Assignee agrees to such transfer.

**NOW, THEREFORE,** for and in consideration of the foregoing recitals and the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and the Assignee hereby covenant and agree as follows:

## ASSIGNMENT

1. **Incorporation of Recitals.** The recitals set forth above are incorporated herein and are made an integral part of this Assignment.

2. **Assignment.** In consideration of the premises, terms and conditions set forth herein, Assignor hereby assigns to the Assignee, each and all of the Interest in Class T interests of TLS, which equals all of Assignor's right, title and interest in and to the Interest in TLS, including, without limitation, all rights to the profits and losses from the TLS Class T. The Assignee hereby accepts such assignment as herein defined.

3. **Representations and Warranties.** Assignor hereby represents and warrants to the Assignee that (i) Assignor has full power and authority, superior to any third party, to execute this Assignment and to consummate the transfer and assignment contemplated hereby; (ii) Assignor has unrestricted title to the Membership Interest of Class T, subject to existing liens of which the Assignee has knowledge; and (iii)

1

there are no consents or approvals of any party required in connection with Assignor's execution and delivery of this Assignment or the consummation of the transactions contemplated hereby. Assignee hereby accepts and acknowledges these representations and warranties and agrees to abide by and be subject to the provisions of the Commonwealth of Puerto Rico Limited Liability Company Act.

  **4. Taxes.** It is agreed that the Assignee will be responsible for any tax imposition by any regulatory agency after the assignment.

  **5. Indemnity and Hold Harmless.** Assignee agrees to and does hereby indemnify and hold harmless Assignor from and against any and all loss, cost, damage and expense of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, court costs and related expenses), resulting from or related to any suits, actions, claims, demands or other matters of any nature whatsoever, arising from acts or omissions occurring from and after the date of execution of this Assignment.

  **6. Governing Law; Jurisdiction.** The laws of the Commonwealth of Puerto Rico shall govern the terms, conditions and performance of this Assignment. All actions to enforce the terms, conditions and performance of this Assignment shall be brought in the Commonwealth of Puerto Rico.

  **7. Survival.** The terms, conditions and covenants set forth in this Assignment shall survive the execution and delivery of the Assignment.

  **7. Entire Agreement; Amendment.** This Assignment is the final, complete, and exclusive agreement of the Parties with respect to the subject matter hereof and supersedes and merges all prior or contemporaneous representations, discussions, proposals, negotiations, conditions, communications, and agreements, whether written or oral, between the Parties relating to the subject matter hereof and all past courses of dealing or industry custom. No modification of or amendment to this Assignment shall be effective unless in writing and signed by each of the Parties.

  **8. Counterparts.** This Assignment of Interests may be executed separately by the parties hereto in any number of counterparts, each of which shall be an original document, but a set

containing all parties signatures, when taken together, shall constitute one and the same complete

document.

IN WITNESS WHEREOF, Assignor has executed this instrument, and Assignee has accepted receipt of

same, as of the date and year first above written.

ASSIGNOR:

_JAY HARRIS_____

Agreed and Accepted:

ASSIGNEE:
SANDPIPER, LLC

By: _____
     Assistant Manager

ACKNOWLEDGEMENT

Acknowledged by TLS Management and Marketing Services, LLC.

Dated: June ____, 2015

TLS Management and Marketing Services, LLC

BY:_____
         Authorized Officer

3

August 27, 2015

BY: CERTIFIED MAIL

Mr. David A. Runge
*Manager*
TLS Management and Marketing Services, LLC
268 Munoz Rivera Avenue, Suite 1006
San Juan, PR 00918

Dear Mr. Runge:

On June 24th I sent you a letter requesting you to terminate our service agreement. After consulting with my attorney I would like to rescind that request and continue our service agreement with TLS.

Thank you for your understanding in this matter.

Cordially,

Jay Harris
President



Tax Law Solutions

October 13, 2015

Mr. Jay Harris
Harris Hospice, Inc.
522 South Edmonds Lane, Suite 103
Lewisville, TX 75067

Mr. Harris:

The purpose of this letter is to confirm and explain the financial aspects of your request for termination of your membership interest in Class T of TLS Management and Marketing Services, LLC effective as of September 30, 2015.

Attached please find the following:

- A copy of the signed Services Agreement between Harris Hospice, Inc. and TLS;

- The financial statements for Class T of TLS Management and Marketing Services, LLC as of the termination date;

- Series Termination Documents;

  - Liability Release Agreement;
  - Record of TLS Management and Marketing Services, LLC Class T Certificate Issued and Transferred;
  - Authorization For the Transfer of Membership Interest;
  - Membership Certificate for Class T.

In accordance with your directive for early termination the following is an explanation of how the financial statement was prepared, and of how the termination fees were computed with specific reference to paragraph (2) of the Termination section of the Services Agreement.

  (b) *Client and/or TLS Members will be responsible for the following costs, which shall collectively be referred to as "Termination Costs":*
    (i) *TLS Division Costs incurred during the Termination Period in the normal course of TLS Division's business, including but not limited to Fees and Allocated Expenses itemized in Appendix B, and any accrued interest payable in accordance with TLS' Loan Policy.*

In accordance with the above provision, TLS Divisions Costs have been computed through the termination date of September 30, and are reported on the attached income statement under Expenses. These expenses include but are not limited to TLS Management Fees and Other Expenses through the termination date.

> (iv) *TLS Members shall each pay a termination fee equal to the Minimum Management Fee, and any other applicable termination expenses, including but not limited to expenses from third parties that are necessary in order to close TLS Division, and any legally required payments to TLS Division Employees who are terminated as a result of termination of this Agreement (collectively, "Termination Fees").*

Under the above provision the applicable termination fees are the Minimum Management Fees of $25,000 for services in accordance with paragraph (2)(a) from Appendix B. Total Termination Fees under paragraph (iv) are therefore $25,000.

> (c) *If Client terminates but fails to give the required notice as stipulated in this Agreement, the Termination Costs shall also include, in addition to the above costs, an Early Termination Fee payable to TLS equal to the sum of the highest three individual months, consecutive or non-consecutive, of Management Fees and Allocated Expenses actually paid by Client to TLS during the twelve month period prior to receipt by TLS of Client's notice of termination.*

Applying the above provision, the computation of the applicable Early Termination Fee of $38,200 is as follows.

| Month | Management Fee | Allocated Expenses | Total |
|---|---|---|---|
| July 2014 | $ 8,500 | $ 2,700 | $ 11,200 |
| August   2014 | $ 8,200 | $ 5,300 | $ 13,500 |
| September 2014 | $ 8,300 | $ 5,200 | $ 13,500 |
| Totals | $ 25,000 | $ 13,200 | $ 38,200 |

Furthermore, in accordance with paragraph (1) under Termination,

> (1) . . . *The latter of (i) the ninetieth day after written notice has been provided to TLS, or (ii) the date on which TLS has received all required termination documentation back from Client and TLS Members including their written concurrence with the final financial statement for the TLS Division, shall be referred to as the Termination Date. Professional Fees shall be due and payable through the Termination Date.*

Timely receipt of the signed documents is necessary in order to make any disbursement. Failure to act in a timely manner can result in additional fees payable to TLS as stated above. Assuming immediate receipt by TLS of all required termination documentation including your signed Financial Statement Acceptance page of the Financial Statement for your TLS Division, it is estimated that you will receive an estimated $371,000 of taxable income related for your outstanding loan, and an estimated $46,765.08 of taxable non-qualified dividend income, subject

to any adjustments, costs or unpaid obligations prior to final closure of your TLS Division. TLS is required to report these events, including your taxable income, to the Internal Revenue Service and other tax authorities.

Upon receipt of your signed Financial Statement Acceptance page of the enclosed financial statement for your TLS Division, we can take further steps that will lead to disbursement of the funds that remain available based on your TLS membership interest. In the interest of clarity, termination is not contingent on receiving the signed Financial Statement. Termination will occur regardless. Rather, distribution of any available cash is contingent on receiving the signed document. Please sign where indicated in the documents and send the originals via courier or USPS.

Sincerely,

Roberto Santos



**TLS Management and Marketing Services, LLC**
270 Munoz Rivera Avenue, PH-1
San Juan, PR 00918

Services Agreement

THIS AGREEMENT is entered into on <u>March 27, 2014</u> by and between Harris Hospice, Inc. ("Client"), and TLS Management and Marketing Services, LLC ("TLS"), (collectively the "Parties") for the sole purpose of Client utilizing TLS to provide Business Services as hereinafter described.

**Scope of Services**

(1) TLS will provide to Client the services itemized in Appendix A ("Business Services"). In order to provide Business Services, TLS will:
    (a) Deploy appropriately skilled resources as are reasonably needed in order to provide Business Services, including TLS employees, employees of TLS affiliates, and individuals who were formerly employed by Client (if applicable) and that have become
        (i) Full-time or full-time-equivalent personnel who are dedicated to Client, including TLS employees, employees of TLS affiliates, and individuals who were formerly employed by Client (if applicable) and that have become employees of TLS or TLS affiliates (collectively, "Division Employees");
        (ii) Personnel who are not dedicated full-time to Client, but whose support is also reasonably needed in order to provide Business Services ("TLS Employees").
    (b) Assume responsibility for service agreements between Client and third parties with whom Client currently has a relationship, or create new relationships either directly between TLS and such existing third parties or with other third party providers including Client, as TLS deems reasonably necessary in order to effectively provide Business Services (collectively, "Division Contractors").
    (c) Division Employees, TLS Employees and Division Contractors shall be collectively referred to as "Division Resources".
(2) Out of the Professional Fees that Client has paid to TLS, TLS will allocate or charge to Client's TLS Division the following as TLS Division Costs:
    (a) The cost of Division Employees, including but not limited to:
        (i) The compensation being paid to Division Employees by TLS, including applicable payroll-related taxes, insurance, employee benefits, and any other legally required payments made for or on behalf of Division Employees;
        (ii) If Division Employees utilize TLS office facilities:
            (1) The cost of office accommodation that is made available, whether on a full-time or part-time basis, including a furnished office or workstation;
            (2) The cost of computer and office equipment, computer software, internet service, local and long distance business telephone service, cellular service, and office supplies (collectively, "Employee Supplies").
        (iii) Recruiting fees and associated expenses incurred at the reasonable discretion of TLS, if applicable.
        (iv) Relocation and temporary housing expenses, if applicable.
    (b) The cost of any Division Contractors.
    (c) The Fees and Allocated Expenses as defined in Appendix B.
    (d) All other reasonable and necessary direct expenses associated with providing Business Services, including reasonable and necessary travel expenses incurred by Division Resources while providing Business Services to Client.
(3) TLS will provide the following additional services to Client:
    (a) Issue to Client's designees ("TLS Members") a separate TLS unit class ("TLS Division") with all such units being owned by TLS Members. Business Services shall be provided to Client from, by and through the TLS Division or a subsidiary that is wholly owned by the TLS unit class.
    (b) Handle accounting matters for the TLS Division.
    (c) If the structure of TLS' US Possession business activities is challenged by any third party or governmental authority, TLS will defend the TLS Division concurrent with and to the extent of any TLS defense of such challenge against TLS.
(4) Client will be responsible for
    (a) Providing to Division Resources:
        (i) An appropriate level of support, guidance, training and feedback in conducting and fulfilling their day-to-day responsibilities in providing the agreed upon Business Services to Client.
        (ii) When working from Client's location, a workstation and other appropriate and necessary equipment and supplies to enable such Division Resources to properly perform Business Services.
    (b) Integrating Business Services into Client's other business operations.
    (c) Payment of any taxes, whether income, payroll or otherwise, due by Client or TLS Division ("Applicable Taxes").

2

(d) All legal and compliance matters related to the offering of products or services for which Business Services is involved. Client agrees to indemnify and hold TLS harmless for all such matters.

Professional Fees

(1) For Business Services rendered under this Agreement, Client shall pay to TLS the following fees ("collectively, Professional Fees"):
  (a) During the Design Phase, a one-time fee of $75,000. The Design Phase shall conclude upon mutual agreement between TLS and Client that the tasks required during the Design Phase have been completed and that TLS is ready to move into the Implementation Phase.
  (b) A monthly fee of $36,112.
  (c) Reimbursement for all TLS Division Costs.
(2) Other Financial Matters:
  (a) Professional Fees are due and payable on the first day of any calendar month or portion thereof during which TLS will be providing Business Services ("Due Date"). If Client fails to pay all Professional Fees by the Due Date, r Division Resources and other costs of Client's Division will be paid out of TLS Division's Retained Earnings, r not paid if in TLS' reasonable judgment the TLS Division's Retained earnings are not sufficient, and no further dividends, loans, or withdrawals of any kind will be available to TLS Members until Client becomes current on all Professional Fees.
  (b) All payments of Professional Fees, and all disbursements made on behalf of Client, shall be made by ACH or wire transfer to or through a bank account designated by TLS.
  (c) TLS Members will be entitled to receive dividends or will have the ability to take loans from the TLS Division, based upon their TLS Division's Retained Earnings, in accordance with TLS' Dividend Policy or TLS' Loan Policy.

Confidentiality

(1) Neither TLS nor Client will directly or indirectly disclose to others any confidential information of the other Party, including but not limited to this Agreement. The Parties may only use confidential information of the other Party for a purpose that is necessary for carrying out the provisions of this Agreement.
(2) Client acknowledges, understands, and agrees that any TLS work product related to the delivery of Business Services including but not limited to (i) information regarding the structure of TLS and of any entities formed in connection with this Agreement, (ii) all agreements between the Parties, including this Agreement, (iii) all agreements with any third parties utilized in connection with this Agreement, and (iv) any other implementation-related documents (collectively, "TLS Reports") contain copyrighted material and are considered to be intellectual property of TLS. Client agrees not to violate TLS' copyright or trademark relative to TLS Reports, and agrees not to disclose, copy or provide, in whole or in part, the contents of TLS Reports to any third party, including but not limited to Client's financial, accounting and legal advisors (collectively, "Client Advisors"), unless that party has also signed a confidentiality agreement with TLS. Client acknowledges that it is Client's responsibility, and not TLS' responsibility, to ensure that a Client Advisor signs the standard TLS confidentiality agreement ("Advisor Confidentiality Agreement"). TLS believes that this transaction is proprietary and exclusive; however, notwithstanding any and all contrary or other provisions within this agreement, in accordance with IRC Section 6011 or such successor or other IRC sections, TLS confirms that there is no limitation on disclosure of the tax treatment or tax structure of the transaction. This tax treatment disclosure, however, does not allow the violation of TLS' trademark or copyright, nor the disclosure of any unique, proprietary and copyrighted materials including TLS Reports to third parties.
(3) Client acknowledges, understands, and agrees that a US Possession Company will be implemented for Client only by TLS or a TLS affiliate, and that implementation of a US Possession Company for Client Control Group by Client or any other third party shall be considered a breach of this Agreement. Furthermore, TLS shall not be responsible for any financial or other consequences or consequential damages that may result from the improper implementation of a US Possession Company by any other third party including Client Advisors.
(4) Client agrees that it shall not at any time during or for a period of two years after the termination of this Agreement, through itself or through any entity controlling, controlled by, related to, or under common control with Client, directly or indirectly ("Client Control Group"), develop or utilize the same or similar structures to those provided through this Agreement ("Similar Services") nor shall Client Control Group obtain Similar Services from any other source. Should Client or Client Control Group do so in violation of this provision, Client or Client Control Group will be liable to TLS for all Management Fees and Allocated Expenses that would have otherwise been due to TLS had TLS itself provided such services to those parties for a period of two years with no annual maximum for the Management Fee (collectively, the



3

"Settlement Fee"), plus all costs incurred by TLS to enforce this agreement. The Settlement Fee shall be computed based on the maximum Management Fees and Allocated Expenses actually paid to TLS during any 24 month period in which Client was obtaining Business Services from TLS under this Agreement or any successor agreement. If an agreement between the parties for Business Services has been in place for less than 24 months, the applicable Settlement Fee shall be the total Management Fees and Allocated Expenses actually paid to TLS extrapolated to a full 24 month period. This remedy is not the sole and exclusive remedy available to TLS and such amount which would be payable to TLS is not as liquidated damages and is in partial consideration for TLS implementing this US Possession Company structure for Client. Client further agrees not to utilize any TLS third party professionals and not to hire or utilize any Division Resources to whom Client has been introduced, may be introduced to, or becomes aware of, by or through TLS or any TLS professionals or advisors.

(5) The Parties recognize and acknowledge that irreparable damage without an adequate remedy at law may result from a breach of the provisions of this Agreement. The Parties therefore agree that, in addition to any and all other remedies available to them, they may apply for and be entitled to a restraining order, injunction, decree of specific performance, or other equitable relief as may be decreed or issued by a court of competent jurisdiction to enforce the provisions of this Agreement to restrain the other Party from such breach without the necessity of posting bond. Either Party, if forced to seek equitable remedies, may obtain such relief without the necessity of posting a bond.

## Termination

(1) The initial term ("Initial Term") of this agreement shall be one year, and shall commence on the date hereof. This Agreement shall automatically renew for successive twelve month periods (each a "Renewal Term") unless, at least ninety days prior to the expiration of the Initial Term or ninety days prior to the expiration of any Renewal Term (the "Termination Period"), either Party gives written notice to the other Party specifically electing to terminate this Agreement effective as of the end of the Initial Term or at the end of any such Renewal Term. The latter of (i) the ninetieth day after written notice has been provided to TLS, or (ii) the date on which TLS has received all required termination documentation back from Client, shall be referred to as the Termination Date. Professional Fees shall be due and payable to TLS through the Termination Date.

(2) Effect of Termination.
   (a) TLS Members will return to TLS all TLS Division units and documents that have been issued or provided to TLS Members.
   (b) Client and/or TLS Members will be responsible for the following costs, which shall collectively be referred to as "Termination Costs":
      (i) TLS Division Costs incurred during the Termination Period in the normal course of the TLS Division's business, including but not limited to Fees and Allocated Expenses itemized in Appendix B, and any accrued interest payable in accordance with TLS' Loan Policy.
      (ii) The remaining term of any agreements with Division Contractors that TLS has entered into in order to provide Business Services, Client shall accept assignment of any such agreements and any obligations related thereto.
      (iii) Subsequent compensation to any Division Employees that will, as a result of termination of this Agreement, be terminated by TLS and hired by Client.
      (iv) TLS Members shall each pay a termination fee equal to the Minimum Management Fee, and any other applicable termination expenses, including but not limited to expenses from third parties that are necessary in order to close the TLS Division, and any legally required payments to Division Employees who are terminated as a result of termination of this Agreement (collectively, "Termination Fees").
   (c) If Client terminates but fails to give the required notice as stipulated in this Agreement, the Termination Costs shall also include, in addition to the above costs, an Early Termination Fee payable to TLS equal to the sum of the highest three individual months, consecutive or non-consecutive, of Management Fees and Allocated Expenses actually paid by Client to TLS during the twelve month period prior to receipt by TLS of Client's notice of termination.
   (d) Payment of Termination Costs shall be made out of any Client-related funds paid to or on deposit with TLS including the TLS Division's Retained Earnings. If TLS Division's Retained Earnings are insufficient to cover such costs, Client shall pay to TLS any Termination Costs in excess of TLS Division's Retained Earnings on the earlier of ten days after notice by TLS or the Termination Date.
   (e) After payment of all Termination Costs, TLS shall return to TLS Members any amount that remains of the TLS Division's Retained Earnings that are related to each of the TLS Members within 30 days after the Termination Date, and prepare and issue all applicable tax forms to TLS Members for the amount refunded, by the applicable government deadlines.

(3) Termination Due to Breach.



4

(a) In the event that either Party is in material breach of this Agreement, with material breach to include (a) a situation in which, as a result of Client's actions or inactions, TLS is unable to provide the Business Services outlined in this Agreement, (b) Client failure to pay the applicable Professional Fees by the Due Date, (c) if TLS and Client are unable to reasonably agree on any Professional Fees left indeterminate in this Agreement by such time as agreement is required by this Agreement, (d) Client failure to give proper and timely notice of termination, or (e) TLS failure to provide Business Services in reasonable accordance with this Agreement; then the non-breaching Party may initiate steps to terminate this Agreement by giving the other Party written notice describing the breach. If the breaching Party (a) does not within thirty days ("Cure Period") of receiving such notice in accordance with the Notices section of General Provisions, cure such breach in the reasonable judgment of the non-breaching Party, or (b) if such breach is incapable of cure in thirty days and if the breaching party does not commence within thirty days commercially reasonable efforts to cure such breach and pursue such efforts diligently (provided the breach shall in any event be cured within sixty days ("Extended Cure Period")), then the Agreement shall terminate at the end of the applicable cure period without need of further action by either Party other than as stipulated herein.

(b) If termination occurs as a result of Client's material breach of this Agreement:
  (i) The Termination Period shall be considered to be the Cure Period or Extended Cure Period as applicable, and the Termination Date shall be considered to be the end of the applicable cure period.
  (ii) Client shall be responsible for all Termination Costs.

(c) If termination occurs as a result of TLS' material breach of this Agreement:
  (i) The Termination Period shall be considered to be the Cure Period or Extended Cure Period as applicable, and the Termination Date shall be considered to be the end of the applicable cure period.
  (ii) TLS shall be responsible for all Termination Fees.

(4) This Agreement shall terminate immediately if either Party (a) fails to perform or observe its obligations under the Confidentiality sections of this Agreement, which shall survive the termination of this Agreement for any reason; or (b) files a petition for bankruptcy, or fails to continue to operate as a going concern.

**General Provisions**

(1) *Indemnification.* The Parties shall indemnify and hold each other harmless from and against any and all claims, whether or not covered by insurance, caused or asserted to have been caused, directly or indirectly, by or as a result of the performance of any intentional acts, negligent acts or omissions of either Party and/or its officers, directors, shareholders, members, agents, employees and/or subcontractors in connection with the performance by the Parties of their obligations under this Agreement.

(2) *Equitable Remedies.* The Parties recognize and acknowledge that irreparable damage without an adequate remedy at law may result from a breach of this Agreement, including without limitation any actual or threatened use of Confidential Information in any manner that is not in accordance with this Agreement. Each Party agrees that the other Party, in addition to any and all other remedies available, may apply for and be entitled to a restraining order, injunction, decree of specific performance, or other equitable relief as may be decreed or issued by a court of competent jurisdiction to enforce the provisions of this Agreement and to restrain the other Party from such breach and/or from rendering any services to any person, firm, or entity in breach of this Agreement. Either Party, if forced to seek equitable remedies, may obtain such relief without the necessity of posting a bond. Client agrees to pay all legal fees and costs of TLS if a preliminary or permanent injunction is ordered due to the actions or inactions of Client, and TLS agrees to pay all legal fees and costs of Client if a preliminary or permanent injunction is ordered due to the actions or inactions of TLS.

(3) *Severability.* If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

(4) *Successors and Assigns.* This Agreement shall be binding upon and inure to the benefit of, and be enforceable by, the Parties as well as their respective successors and permitted assigns. Neither this Agreement nor any part hereof shall be assigned by either Party without the prior written consent of the other Party, and such written consent shall not be unreasonably withheld. Nothing in this Agreement, expressed or implied, is intended to confer any person, other than the Parties and their successors, any rights or remedies under or by reason of this Agreement.

(5) *Waivers.* The failure of any Party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

(6) *Counterparts.* This Agreement may be executed in counterparts, each of which when executed and delivered will be deemed to be an original, and all of which taken together will constitute one and the same agreement.



5

(7) *Entire Agreement; Amendments.* This Agreement contains the entire agreement of the Parties relating to the subject matter hereof. All previous agreements or working arrangements between the Parties relative to the subject matter herein, whether in writing or oral, shall be superseded and terminated as of the date hereof. Except as otherwise provided herein, this Agreement may not be changed orally, but only by an agreement in writing signed by the Party against whom enforcement of any change, waiver, modification, extension or discharge is sought.

(8) *Rights and Remedies Cumulative.* The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any Party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the Parties may have.

(9) *Notices.* Any notices or other communications required or permitted under this Agreement shall be sufficiently given if delivered personally, or if sent by courier service or registered or certified mail, to the addresses below or to any other address furnished in writing by one Party to the other, and shall be deemed to have been given as of the date mailed to the receiving Party by courier service or registered or certified mail. The failure or refusal of any Party to accept any notice given pursuant to this paragraph shall be conclusively deemed receipt thereof and knowledge of its contents.

If to TLS:    TLS Management and Marketing Services, LLC
270 Munoz Rivera Avenue, PH-1
San Juan, PR 00918

If to Client:    Harris Hospice, Inc.
522 S Edmonds Lane, Suite 103
Lewisville, TX 75067

(10) *Representations and Warranties.* Each Party represents and warrants to the other Party that: (a) it has (and the persons signing on its behalf have) the authority and power to enter into this Agreement and that all actions necessary to authorize, approve, execute, and perform this Agreement have been taken; and (b) in performing its obligations under this Agreement it will comply with all laws, regulations, and policies of any agency having jurisdiction.

(11) *No Warranty.* Client acknowledges that TLS has not made and will not make any express or implied warranties or representations that the services provided by TLS will result in any particular amount or level of business or income to Client. Nothing herein, however, shall excuse TLS from the timely and satisfactory performance of its duties hereunder.

(12) *Additional Documents.* Each of the parties agrees to execute any document or documents that may be reasonably requested from time to time by the other party to implement or complete such party's obligations pursuant to this Agreement.

(13) *Contract Modifications for Prospective Legal Events.* If any laws or regulations, now existing or enacted or promulgated after the effective date of this Agreement, are interpreted by judicial decision, a regulatory agency or TLS legal counsel in such a manner as to indicate that the structure of this Agreement may be in violation of such laws or regulations, or potentially conflicts with such interpretations of the Internal Revenue Code or other equivalent authority, Client and TLS agree to amend or modify and shall amend or modify this Agreement as is necessary in order to comply with such laws or regulations. To the maximum extent possible, any such amendment shall preserve the underlying economic and financial arrangements between Client and TLS.

(14) *Facsimile Signatures.* Facsimile signatures on notices and amendments are the equivalent of original signatures.

(15) *Governing Law.* This Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the Commonwealth of Puerto Rico where exclusive venue shall reside, and shall be deemed to have been executed in that domicile.

IN WITNESS WHEREOF, the Parties have executed this agreement on the date first written above.

TLS Management and Marketing Services, LLC          Harris Hospice, Inc.

By: _____          By: _____

Print Name: Ricky Rodriguez          Print Name: Jay Harris

Title: Managing Director          Title: President

6

Appendix A:
Business Services

In accordance with the service agreement TLS will provide the following Services:

Marketing Services

1) TLS will perform a competitive analysis study of three companies. These three companies will include Harris Healthcare, Inc., Hospice Plus and Vitas. The study will include all digital venues, website, google, social media platforms and published news and creative. The process may include research calls per each service provider to solicit additional information. Main areas to cover are:

    a) Location
    b) Price for services
    c) Competitive advantage
    d) Services
    e) Brand and brand promise
    f) Target market
    g) Communications efforts

TLS will deliver the competitive analysis in the form of a power point presentation that will include one specific section per company and a comparison table at the end. Each report will include closing remarks and recommendations.

2) TLS will review the digital marketing efforts in order recommend ways to improve the web image and the look and feel of the client's web presence.

3) TLS will review conditions that may increase the traffic to the client's webpage.

4) TLS will create a monitoring process for tracking traffic with analytics of the company's webpage.



7

Appendix B:
*Fees and Allocated Expenses*

Client understands, acknowledges, and agrees that, out of any Professional Fees paid to TLS by Client, and prior to payment of any other TLS Division Costs, TLS will be entitled to receive and retain:

(1) Set-up Fee:
    (a) The one-time Set-up Fee shall be equal to $25,000.

(2) Management Fee:
    (a) The Management Fee shall be equal to the greater of $25,000 ("Minimum Management Fee") or ten percent (10%) of the calendar year-to-date Gross Profit of the TLS Division less the Allocated Expenses described below, to a maximum of $100,000 per calendar year per TLS Division that is required to be established. It is recognized and understood that a single TLS Division cannot charge Client as Professional Fees, as a guideline, an amount in excess of 20% of a Client's Gross Revenues.
    (b) The Minimum Management Fee is due and payable to TLS on the date of this Agreement, and again on January 1 of each subsequent calendar year or portion thereof in which TLS is providing Business Services under this Agreement or any successor agreement. No additional Management Fees beyond the Minimum Management Fee will be owed in a calendar year, until the Gross Profit of the TLS Division has exceeded $250,000 in that calendar year.

(3) Allocated Expenses, which shall consist of two components:
    (a) The tax component ("Applicable Taxes") shall be equal to the statutorily required taxes of any kind, including 4% of the Net Income of the TLS Division for income taxes, plus any other applicable municipal, payroll, property or other taxes.
    (b) The Employee Component shall be equal to the greater of $25,000 ("Minimum Employee Component") or six percent (6%) of the calendar year-to-date Gross Profit of the TLS Division, to cover certain costs and expenses of TLS Employees who are providing Business Services to Client.
    (c) The Minimum Employee Component is due and payable to TLS as follows:
        (1) In an amount pro-rated through the end of the Initial calendar year ("Pro-Rated Employee Component"), on the date of this Agreement. No additional Employee Component beyond the Pro-Rated Employee Component will be owed in the Initial calendar year, until 6% of the Gross Profit of the TLS Division exceeds the Pro-Rated Employee Component.
        (2) In full, on the first day of each subsequent calendar year or portion thereof in which TLS is providing Business Services under this Agreement or any successor agreement. No additional Employee Component beyond the Minimum Employee Component will be owed in each subsequent calendar year until 6% of the Gross Profit of the TLS Division exceeds the Minimum Employee Component.

(4) If Client advises TLS at least ninety days prior to the expiration of the Initial Term or ninety days prior to the expiration of any Renewal Term that, during the subsequent Renewal Term, Client does not desire Business Services and does not intend to pay Professional Fees but desires to keep the TLS Division in place ("Suspension of Service"), an annual Compliance Fee equal to the greater of (a) $10,000 or (b) 1% of the TLS Division's Retained Earnings at the end of the last complete calendar month during the current term up to a maximum of the Minimum Management Fee, shall replace the Management Fees and Allocated Expenses that would otherwise be due and payable to TLS under this Agreement. A Suspension of Service shall only be allowed if Client is current on all financial obligations related to this Agreement. The Compliance Fee will be due on the first day of the applicable Renewal Term. Any reasonable and necessary TLS Division Costs, including any payments related to investments of the TLS Division, shall be due and payable as incurred. If after requesting a Suspension of Service, Client desires to reactive Business Services, a Set-Up Fee of $10,000 will be due and payable to TLS.





Tax Law Solutions

# Class T – Puerto Rico Division

## September 30, 2015

### Financial Statements

(Calendar Basis)

For Internal Use Only - Not to be Distributed

BALANCE SHEET

**TLS Management and Marketing Services LLC**
**Balance Sheet - Class T**
As of September 30, 2015

| | Class T (Puerto Rico Division) |
|---|---|
| ASSETS | |
| Current Assets | |
| Checking/Savings | 46,765.08 |
| Class T Checking #6197 | 46,765.08 |
| Total Checking/Savings | 46,765.08 |
| Total Current Assets | |
| Other Assets | 371,000.00 |
| Note Receivable | 371,000.00 |
| Total Note Receivable | 371,000.00 |
| Total Other Assets | 417,765.08 |
| TOTAL ASSETS | |
| LIABILITIES & EQUITY | |
| Equity | 417,765.08 |
| Retained Earnings | 417,765.08 |
| Total Equity | 417,765.08 |
| TOTAL LIABILITIES & EQUITY | |

INCOME STATEMENT

# TLS Management and Marketing Services LLC
## Income Statement - Class T
### January 1 through September 30, 2015

|  | Jan - Sep 15 |
|---|---|
| Ordinary Income/Expense |  |
| Income | 8,641.00 |
| Total Income | 8,641.00 |
| Cost of Goods Sold |  |
| TLS Employee Component | -5,300.00 |
| Total COGS | -5,300.00 |
| Gross Profit | 13,941.00 |
| Expense |  |
| Early Termination Fee | 38,200.00 |
| Termination Fee Expense | 25,000.00 |
| TLS Management Fee and Other Expenses | 1,266.00 |
| Computer and Internet Expenses | 119.40 |
| Tax Expense |  |
| Class T | 1,653.96 |
| Total Tax Expense | 1,653.96 |
| Total Expense | 66,239.36 |
| Net Ordinary Income | -52,298.36 |
| Net Income | -52,298.36 |

**TLS Management and Marketing Services, LLC**
**Notes to the Interim Financial Statements**

Definitions of certain financial statements items:

*Checking/Savings*

Cash Balance in your division at the end of the current reporting period.

*Note Receivable*

TLS Loan Program balance.

*Class Equity*

Represent the .02% membership interest in TLS Management & Marketing Services, LLC.

*Professional Fees Income*

Total of funds received by the division during the current calender year.

*TLS Employee Component*

TLS Employee Component as disclosed in the Agreement.

*TLS Management Fee and Other Expenses*

TLS Management Fee as disclosed in the Agreement.

*Tax Expense*

The division tax provision.

*Membership Buy-Sell Agreement*

As provided in the Buy-Sell Agreement signed by the members; TLS is buying member's interest in the LLC by making the following Distribution:

| | |
|---|---|
| Total cash distribution | 46,765.08 |
| Note Receivable | 371,000.00 |
| Total Distribution | $417,765.08 |

## Financial Statement Acceptance

I, Jay W. Harris, have received the Class T-Puerto Rico Division Financial Statements of TLS Management and Marketing Services, LLC, ("TLS LLC") for the calendar year period ended on September 30, 2015, provided to me by TLS LLC, including its Balance Sheet, Profit and Loss Statement and Notes to the Financial Statements. I accept and acknowledge that I and/or my representatives have fully read and examined all such information and that I understand all such financial information and/or it has been thoroughly explained to me by my representatives, to my entire and complete satisfaction; therefore, after careful review of the same, I herein accept and acknowledge that the content and extent of such financial information as therein conveyed is for all purposes a full, complete and accurate representation of the Class T Puerto Rico Division Financial Statements of TLS LLC for the calendar year period ended on September 30, 2015.

_Jay W. Harris_
Jay W. Harris

_01/13/16_
Date

Liability Release Agreement

This Liability Release ("Release"), effective as of September 30, 2015 (the "Effective Date"), is made and entered into among TLS Management and Marketing Services, LLC (the "Consultant"), Jay Harris, Harris Hospice, Inc., all and/or any entity or entities, controlling, controlled by, related to, affiliated, on which Mr. Harris, his agents, administrators, representatives, heirs, successors, devisees, and assigns have any ownership, membership and/or participation of any class or form, under common control with, directly or indirectly any of the aforementioned ("Client Control Group"), (hereinafter, the "Clients").

Recitals

Clients previously entered into an agreement with consultant and own or have owned Class T shares in Consultant (the "Agreement").

Clients wish to terminate and withdraw from the Agreement with Consultant in accordance with the terms of the Agreement.

Accordingly, Consultant and the Clients agree as follows:

**Release by Clients** In consideration of the entry by Consultant into this Release and other consideration provided for in the Agreement and this Release, that being good and valuable consideration, the receipt, adequacy, and sufficiency of which are acknowledged by the Clients. The Clients, on their own behalf and on behalf of the Clients' agents, administrators, representatives, heirs, successors, devisees, and assigns (collectively, the "Client Releasing Parties") hereby fully release, acquit, and forever discharge Consultant, Consultant's successors, heirs, and assigns (collectively, the "Consultant Released Parties"), jointly and severally, from any and all claims, whether known or unknown, suspected or unsuspected, accrued or not, whether at law, equity, or otherwise, and whether for injunctive relief or compensatory, punitive or any other kind of damages, which any of the Client Releasing Parties ever have had in the past, presently have, or may have in the future against the Consultant Released Parties, and each of them, arising from or relating to Consultant's engagement by the Clients pursuant to the Agreement, termination of the Agreement, or any circumstances related to the termination, or any other matter, cause or thing whatsoever, from the beginning of time and up and including the date of the execution of this Release. The Clients agree that they will not commence, maintain, initiate, or prosecute, or cause, encourage, assist, volunteer, advise or cooperate with any other person to commence, maintain, initiate or prosecute, any action, lawsuit, proceeding, charge, petition, complaint or claim before any court, agency or tribunal against Consultant arising from, concerned with, or otherwise relating to, in whole or in part, Consultant's engagement by the Clients pursuant to the Agreement, termination of the Agreement or any circumstances related to the termination or any of the matters discharged and released in this Release.

**Reinstatement by Client.** Client further agrees to reinstate acceptance and acknowledges the survival and binding capacity, upon termination of the Agreement, of the Confidentiality

and Termination Clause, of the Service Agreement signed on March 27, 2014 specially but not limited to Article 4 of the Termination Clause which reads as follows:

(4) Client agrees that it shall not at any time during or for a period of two years after the termination of this Agreement through itself or through any entity controlling, controlled by, related to, or under common control with Client, directly or indirectly ("Client Control Group"), develop or utilize the same or similar structures to those provided through this Agreement ("Similar Services") nor shall Client Control Group obtain Similar Services from any other source. Should Client Control Group do so in violation of this provision, Client or Client Control Group will be liable to TLS for all Management Fees that would have otherwise been due to TLS had TLS itself provided such services to those parties for a period of two years with no annual maximum, plus all costs incurred by TLS to enforce this agreement. This remedy is not the sole and exclusive remedy available to TLS and such amount which would be payable to TLS is not as liquidated damages and is in partial consideration for TLS implementing this US Possession Company structure for Client. Client further agrees not to utilize any TLS third party professionals to whom Client has been introduced, may be introduced to, or becomes aware of, by or through TLS or any TLS professional or advisors.

IN WITNESS WHEREOF, the parties have executed this Release as of the Effective Date above.

TLS Management and Marketing
Services, LLC

By_____
Manager

Harris Hospice, Inc.

By_____
President

Jay Harris

By_____

Page 2 of 2

## RECORD OF TLS MANAGEMENT AND MARKETING SERVICES LLC
### CLASS T CERTIFICATES ISSUED AND TRANSFERRED

| CERTIFICATE ISSUED | | ISSUED TO | DATE ISSUED | SHARES TRANSFERRED FROM | AMOUNT PAID THEREON | RECEIVED CERTIFICATE | |
|---|---|---|---|---|---|---|---|
| CERTIF. NOS. | NO. Units | (NAME AND ADDRESS) | | (IF ORIGINAL ISSUE ENTER AS SUCH) | | DATE | SIGNATURE |
| 1 | 1,000 | Jay Harris | 3/27/2014 | ORIGINAL ISSUE | $10 | 3/27/2014 | |
|  | 1,000 | TLS Management and Marketing, LLC | 9/30/2015 | Jay Harris | | 9/30/2015 | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

TLS MANAGEMENT AND MARKETING SERVICES, LLC

AUTHORIZATION FOR THE TRANSFER OF MEMBERSHIP INTEREST

AGREEMENT made on this date, September 30, 2015 between Jay Harris and TLS Management and Marketing Services, LLC, a Puerto Rican Limited Liability Company.

WHEREAS Jay Harris (Member) is the owner of 0.02% of TLS Management and Marketing Services, LLC (TLS) Class T.

WHEREAS TLS is the Manager of TLS Class T.

WHEREAS Member wants to assign their ownership interest in TLS Class T back to TLS.

WHEREAS Member and TLS signed a Buy-Sell Agreement dated March 27, 2014.

WHEREAS TLS authorizes the assignment of the membership from Member to TLS in accordance with the terms of the Buy-Sell Agreement.

Agreed on the first date mentioned above, by

TLS MANAGEMENT AND MARKETING SERVICES, LLC

By:_____
    Manager

Member

By:_____
Jay Harris
    Member



H.S. Management & Marketing Service, LLC

ORGANIZED UNDER THE LAWS OF THE COMMONWEALTH OF PUERTO RICO

MEMBERSHIP CERTIFICATE

CLASS T

This Certifies that          Jay Harris

is a member of the above named Limited Liability Company and is entitled to the full benefits and privileges of such memberships, subject to the duties and obligations, as more fully set forth in the Limited Liability Company Operating Agreement.

In Witness Whereof, the Limited Liability Company has caused this Certificate to be executed by its duly authorized members this   27th   day of   March   2014

MEMBER

MEMBER

© 1999 CORPEX BANKNOTE CO., BAY SHORE, N.Y.

FOR VALUE RECEIVED,_____JAY HARRIS_____ *hereby sells, assigns and transfers*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

| | ONE THOUSAND (1,000) UNITS | CLASS T |

*unto* TLS MANAGEMENT AND MARKETING, LLC *the Membership Interest represented by the within*

*Certificate, and does hereby irrevocably constitute and appoint* JAY HARRIS
*Attorney to transfer the said Membership Interest on the books of the within-named Limited Liability
Company with full power of substitution in the premises.*

*Dated,_____SEPTEMBER 30, 2015_____
In presence of*

_____                    _____
                                                            (Member)

_____                    _____
                                                            (Member)

# O'NEILL & BORGES LLC

250 MUÑOZ RIVERA AVENUE, SUITE 800
SAN JUAN, PUERTO RICO 00918-1813

TELEPHONE: (787) 764-8181
TELECOPIER: (787) 753-8944
ALEJANDRO.GARCIA@ONEILLBORGES.COM

ALEJANDRO J. GARCÍA
ASSOCIATE
(787) 282-5724

November 3, 2016

*By email and priority mail*

Michael E. McCue
Meadows, Collier, Reed, Cousins, Crouch & Ungerman, L.L.P.
901 Main Street, Suite 3700
Dallas, Texas 75202

**Re: Mr. Jay Harris**
**Harris Hospice, Inc.**

Mr. McCue:

TLS Management and Marketing Services, LLC ("TLS") acknowledges receipt of your October 18, 2016 letter (the "Letter"). Your demand that TLS pay Mr. Harris $46,765.08 is based on erroneous information. Mr. Harris' relationship with TLS stems principally from four contracts: a Line of Credit Promissory Note ("Note"), its Security Agreement, a Buy-Sell Agreement and a Services Agreement (collectively, the "Agreements"). TLS has consistently adhered to the terms of those Agreements. The same cannot be said of Mr. Harris. An analysis of the Agreements, along with the course of dealings between the parties, shows that it is actually Mr. Harris who has outstanding debts with TLS. Specifically, the balance of Mr. Harris' outstanding loan from TLS is $371,000.00. This amount, less any collateral retained by TLS, plus uncollected fees and costs (if any), is still due and owing. In the interest of clarity, the following is a brief summary of the contractual relationship between TLS and Mr. Harris, along with the company's causes of action.

While it is true that Mr. Harris provided written notice invoking his right to terminate the Services Agreement in a letter dated June 27, 2015, he subsequently rescinded his request on August 26, 2015. (See attached). After that, TLS learned Mr. Harris had been sharing the company's confidential information with Ricky Rodríguez, its former Managing Director. The confidentiality provisions of the Services Agreement barred him from doing so. In any case, TLS did eventually accept the termination of the Services Agreement – despite that Mr. Harris did not provide the requisite ninety days written notice. Although TLS did notify Mr. Harris he was entitled to receive $46,765.08 in dividend income in its October 13, 2015 letter, this distribution

Letter to Michael E. McGue, P.C.
Page 2
November 3, 2016

was contingent on "the immediate receipt by TLS of all required termination documentation including your [Mr. Harris'] signed Financial Statement Acceptance page of the Financial Statement for your TLS Division." TLS did not receive those documents until May 12, 2016. A delay of seven (7) months is decidedly not immediate receipt. By this point, TLS's offer to distribute the $46,765.08 in dividend income was no longer on the table. TLS exercised its right to terminate Mr. Harris' membership interest regardless.

Mr. Harris defaulted on the Promissory Note and the Security Agreement the moment his membership interest in TLS was terminated. By virtue of those two agreements, TLS was entitled to "declare the entire amount" of the loan "due and owing," which renders it "immediately due and payable." As previously stated, Mr. Harris' outstanding loan balance was $371,000.00. And TLS has every right to "execute the collateral pledged to TLS in your [Mr. Harris'] signed Promissory Note." But, in a show of good faith – and despite its right to collect on it – TLS, in its March 11, 2016 letter, offered to forgive any debt that remained outstanding after it executed the collateral. As explained in its September 6, 2016 letter, because TLS "did not receive a response from you [Mr. Harris] as to the repayment of your outstanding loan" it was "forced to execute your collateral as agreed upon in the Security Agreement." While TLS then withdrew its offer of loan forgiveness, it informed Mr. Harris he would receive "any funds remaining" in his "division, if any, after your outstanding loan amount is satisfied." No funds remained.

TLS has repeatedly informed Mr. Harris of his outstanding debts – and its collection efforts have been to no avail. In the absence of a productive dialogue that leads to an amicable resolution - particularly in the face of threats from your client - TLS will pursue its rights under the various Agreements.

We hope to hear from you soon.

Sincerely,

Alejandro J. García

cc. Manuel Pietrantoni, Esq.

---

**Jay Harris**

| | |
|---|---|
| From: | Jay Harris [jay@harrishospice.com] |
| Sent: | Thursday, September 03, 2015 10:06 AM |
| To: | 'Dave Runge' |
| Subject: | RE: PFIC |

Dave,

I assure you this is me and me alone. As I told you yesterday when my accountant was preparing my taxes for 2014 she said she thought I needed to file the loans I received from TLS in 2014 as a PIFIC, but I should check with TLS first. Which I did, and I did not get a response. I assumed everything was alright because I joined TLS to protect myself and this investment from such an event.

So, please answer the question. Is TLS considered a Passive Foreign Investment Company (PFIC)?

Thanks,

Jay

**From:** Dave Runge [mailto:drunge@taxlawsolutions.net]
**Sent:** Thursday, September 03, 2015 9:53 AM
**To:** Jay Harris
**Cc:** Manuel A. Pietrantoni
**Subject:** Re: PFIC

Its not you writing this memo, Jay. We both know that.

Apparently we need to have all further communications occur between your attorney and our attorney. You may want to review the letter that our attorney sent to you. It indicates the choices available – to both of us - and the implications for you of each choice.

*David Runge*
Tax Law Solutions, LLC
268 Muñoz Rivera Avenue, Suite 1006
San Juan, PR 00918
Email: drunge@taxlawsolutions.net
Phone: 303.775.0727
Fax: 303.557.6315

WARNING: This communication contains privileged information property of TLS Management and Marketing Services LLC. This information and/or any attachments are for exclusive use of the intended recipient. If you received this communication by error, you are hereby notified that any action taken over its content is strictly prohibited.

Confidentiality Notice: The information contained in the e-mail may be confidential and privileged and is for the use of the intended recipient only. If you are not the intended recipient, or an authorized employee or agent responsible for delivering it to the intended recipient, the dissemination, distribution or reproduction of this message or its contents (including any attachments) is strictly prohibited. If you receive this message in error, please notify us immediately by reply e-mail, and permanently delete this message and any copies from your system and files. Email transmission cannot be guaranteed to be secured or error free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission.

Legal Disclaimer: This message does not create or imply an attorney-client relationship. This message is not intended to provide legal advice as TLS Management and Marketing Services LLC. is not a law firm.

Income Tax Disclosure: The information contained in this communication, including attachments and enclosures, is not intended as a thorough, in-depth analysis of specific income tax issues, nor a substitute for a formal tax opinion, nor can it be used for the purpose of avoiding penalties that may be imposed with regard to the tax consequences arising from any transactions or matters discussed within this message.

**From:** Jay Harris <jay@harrishospice.com>
**Date:** Thursday, September 3, 2015 at 10:29 AM
**To:** David Runge <drunge@taxlawsolutions.net>
**Subject:** PFIC

Dear Dave Runge,
Just wanted to follow up with getting your opinion about TLS's status with the IRS. Is TLS considered a Passive Foreign
Investment Company (PFIC) ? Do I need to report the loan from TLS for 2014 from my TLS business?
Thank you,
Jay Harris

*Exhibit L*

**Jay Harris**

**From:** Support [support@taxlawsolutions.net]
**Sent:** Friday, September 11, 2015 5:32 PM
**To:** Support
**Subject:** Memo to TLS Clients

Dear Client,

We periodically receive inquiries regarding whether or not Tax Law Solutions ("TLS") is a Passive Foreign Investment Company ("PFIC") and regarding what, if any, tax reporting requirements might then arise. Whether or not a company is a PFIC, is based on a two-part test. Depending on how certain definitions are interpreted, and taking a conservative interpretation of the applicable rules and definitions - TLS does appear to qualify as a PFIC based on one of the two tests. Even if TLS is a PFIC, your attributable income based on your TLS shareholdings falls below the di minimis tax reporting requirements, based on guidance issued by the IRS in 2013. However, income tax related obligations could potentially arise if you receive taxable distributions from TLS. By way of example, salary or dividends would be two methods considered taxable distributions, whereas loans (if properly structured, administered and adhered to) are generally not considered taxable distributions.

This is a complicated area of tax law, where it is important that you identify and rely only on tax professionals who have significant experience in this area of United States taxation to ensure that you obtain accurate guidance regarding the applicable rules, are not misled in any way, and that this information is applied in the context of your own individual circumstances. Therefore, you may wish to discuss this further with your income tax preparer, and if further questions arise, we are happy to speak directly with your tax preparer.

Regards,

Tax Law Solutions, LLC
268 Muñoz Rivera Avenue, Suite 1006
San Juan, PR 00918
Email: support@taxlawsolutions.net
Phone: (787) 200-3359

| Form **211** (March 2014) | **Department of the Treasury - Internal Revenue Service** **Application for Award for Original Information** | OMB Number 1545-0409 |
|---|---|---|
| | | Date Claim received |
| | | Claim number (completed by IRS) |

**1.** Name of taxpayer (include aliases) and any related taxpayers who committed the violation

(1) Richard M. Colombik and (2) David A. Runge

**2.** Last 4 digits of Taxpayer Identification Number(s) (e.g., SSN, ITIN, or EIN)
(1) 6164 (2) 2655

**3.** Taxpayer's address, including ZIP code
(1) 40 Hawthorne Lane Barrington Hills, IL 60010
(2) 2525 Arapahoe Ave. Suite E4-145 Boulder, CO 80302

**4.** Taxpayer's date of birth or approximate age
(1) 07/16/1953 (2) 08/09/1956

**5.** Name and title and contact information of IRS employee to whom violation was first reported, if known

**6.** Date violation reported (in number 5), if applicable

**7.** Did you submit this information to other Federal or State Agencies
☐ Yes  ☒ No

**8.** If yes in number 7, list the Agency Name and date submitted
I will later on.

**9.** Is this ☒ New submission or ☐ Supplemental submission
If a supplemental submission, list previously assigned claim number(s)

**10.** Alleged Violation of Tax Law (check all that apply)
☒ Income Tax  ☐ Employment Tax  ☐ Estate & Gift Tax  ☐ Tax Exempt Bonds
☐ Employee Plans  ☐ Governmental Entities  ☐ Exempt Organizations  ☐ Excise
☐ Other (identify)

**11.** Describe the Alleged Violation. State all pertinent facts to the alleged violation. (Attach a detailed explanation and include all supporting information in your possession and describe the availability and location of any additional supporting information not in your possession.) Explain why you believe the act described constitutes a violation of the tax laws

See attached.

**12.** Describe how you learned about and/or obtained the information that supports this claim. (Attach sheet if needed)
While working for the two taxpayers on their business, I noted the continuous tax law issues on several of their practices. The issues existed even before I worked for the company and it aggravated after I left the company.

**13.** What date did you acquire this information   From 2012 until 2015

**14.** What is your relationship (current and former) to the alleged noncompliant taxpayer(s)? Check all that apply. (Attach sheet if needed)
☐ Current Employee  ☒ Former Employee  ☐ Attorney  ☐ CPA
☐ Relative/Family Member  ☐ Other (describe)

**15.** Do you still maintain a relationship with the taxpayer  ☐ Yes  ☒ No

**16.** If yes to number 15, describe your relationship with the taxpayer

**17.** Are you involved with any governmental or legal proceeding involving the taxpayer  ☐ Yes  ☒ No

**18.** If yes to number 17, Explain in detail. (Attach sheet if needed)

**19.** Describe the amount of tax owed by the taxpayer(s). Provide a summary of the information you have that supports your claim as to the amount owed (i.e. books, ledgers, records, receipts, tax returns, etc). (Attach sheet if needed)
See attached

**20.** Fill in Tax Year (TY) and Dollar Amount ($), if known
TY 2011 $ 700,000  TY 2012 $ 1,800,000  TY 2013 $ 3,600,000  TY 2014 $ 4,700,000  TY Curr. $ 3,000,000

**21.** Name of individual claimant
Ricky Rodriguez

**22.** Claimant's date of birth (MMDDYYYY)
04/13/1970

**23.** Last 4 digits of Claimant's SSN or ITIN
XXX-XX-9302

**24.** Address of claimant, including ZIP code
147 Ciudad Jardin
Gurabo, PR 00778

**25.** Telephone number (including area code)
(787)550-8504

**26.** Email address  ricky@nsgcpas.com

**27.** Declaration under Penalty of Perjury I declare that I have examined this application, all accompanying statement and supporting information, and, to the best of my knowledge and belief, they are true, correct, and complete

Signature of Claimant

Date  July 17, 2015

Catalog Number 16571S    www.irs.gov    Form **211** (Rev. 3-2014)

## Detailed explanation for question No.11

Both taxpayers included in Form 211 are affluent U.S. individuals that have paid little or no taxes for several years, but owned expensive vehicles, enjoy properties of high value throughout the nation and have extravagant lifestyles. They are also tax advisors that have spread their tax misbehavior on their clients.

They are using schemes to divert the income and even use strategies in the Turks and Caicos ("TC") to avoid taxation in the U.S.

I worked for them as Chief Financial Officer and later as Managing Director. Through my work I was disclosed information on how they illegally diverted millions of dollars to a company in the TC. The scheme as I review it was illegal and they have been using it for at least 5 years prior to my arrival. During my term, they diverted about $1.2M of U.S. taxable income yearly through the TC structure alone. They also diverted about another $1M or more of U.S. taxable income through shell entities in the U.S. Combined that I'm aware of, they diverted over $2M yearly of U.S. taxable income. One of the companies has been established for about 7 years and the other for about 8.

On top of that, they currently have a company in Puerto Rico ("PR") that have several tax issues that I will enumerate below:

1. The company is classified as a PFIC and none of the U.S. shareholders have performed their appropriate filings and paid the appropriate taxes.
2. The principals are claiming to be PR residents for tax purposes, but they are in breach of U.S. IRC §937. Therefore, their income is fully taxable in the U.S. In 2013 the income for one was $2M and 2014 close to $1M. For the other 2014 is about $2.5M
3. They are owners/employees and have a disproportioned and absurd allocation of wages and distributions, therefore owning money to the SSA.
4. They are currently operating a tax scam where clients pay them fees for doing nothing and then they return the money to the clients as loans to prevent U.S. taxation – to some even the next working day. The money is being tax in PR at 4% but it is not PR source income it is U.S. source income, as PR has done nothing to earn it (no economic substance). The materiality of this is for 2014 about $9M in fees paid by clients and about $5M currently. The scam involved their clients who trusted them in a tax scheme.

The location of the supporting information is located mostly in 268 Muñoz Rivera Avenue Suite 1006, San Juan, Puerto Rico 00918 and 1 Pierce Place Suite 460E Itasca, IL 60143. But some might be located at the taxpayers' home in IL and CO.

## Detailed explanation for question No.19

The taxpayer have violated several sections of the code that I will summarized below:

1. Using a scheme to prevent U.S. taxation with entities both in the U.S. and the TC with disregard of U.S. IRC enacted rules. Amount of tax due here is to be determined but scheme is running for more than 9 years. When I joined amount was close to $2M a year with possible tax impact of $700K per year.

2. The PFIC classification should drive around $1M to $3.5 on taxes a year depending on the year. The auditor would have to decide whether to pursue the PFIC or the economic substance rule describe next.

3. The source of income and economic substance doctrines are in violation of the U.S. IRC. The PR entity is not performing services to claim the income in PR. If the IRS claim is sustained the amount of tax due could be around $2M to $4.5M

4. Tax Scheme – this is the process of paying the company money on day 1 and on day two the client receives the money back as a loan. No services were perform to sustain such initial payment. The loan is a disguise dividend or scheme to prevent U.S. taxation.

In terms of the supporting information regarding the claims, I have the following:

➢ Accounting systems backups for all the entities
➢ Domestic bank statements
➢ Offshore bank statements
➢ Contracts and Agreements
➢ E-mails
➢ Supporting reports and analysis on allocations of income
➢ Income tax returns for some of the entities
➢ Name and contact information for some of the clients
➢ Receipts
➢ Records
➢ Payroll reports

I have everything in electronic format and will make it available as requested.

This is perhaps one of the biggest cases for the IRS because it involves tax advisors that have been illegally diverting U.S. taxation for years and have done it for their clients. Therefore, you don't only get two illegal tax evaders, but you might get 20 in the process. They have also created over 5,000 tax strategies using their methodologies.

The IRS auditor will not be alone, I'm also an auditor and accounting professional that will assist throughout the process.

These individuals damage the profession and we should get them to justice.